(No. 70758.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LLOYD WAYNE HAMPTON, Appellant.

*Opinion filed May 21, 1992.—Rehearing denied June 25, 1992.*

Charles M. Schiedel, Deputy Defender, and Theodore A. Gottfried, State Appellate Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen, Assistant Attorney General, of Chicago, of counsel), for the People.

JUSTICE BILANDIC delivered the opinion of the court:

On February 15, 1990, defendant, Lloyd Wayne Hampton, was charged by indictment in Madison County with three counts of first degree murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(3)), two counts of armed violence (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2) and one count of home invasion (Ill. Rev. Stat. 1989, ch. 38, par. 12—11). Defendant subsequently pled guilty to the three murder counts, and the armed violence and home invasion charges were dismissed on the State's motion. The trial court accepted defendant's guilty pleas and entered an order finding defendant guilty of three counts of first degree murder. Defendant chose to waive his right to have a jury at his death penalty hearing. The trial judge thereafter found that defendant was eligible for the death penalty under section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6)), and further found that there were no mitigating factors sufficient to preclude a sentence of death. The judge entered an order sentencing defendant to death. That sentence was stayed (134 Ill. 2d R. 609(a))

pending defendant's direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603).

On February 9, 1990, defendant was arrested at a truck stop in Troy, Illinois, in connection with a charge not related to the instant case. Defendant was subsequently suspected of having been involved in the murder of Roy E. Pendleton and was questioned by Troy police officers about the murder. Defendant confessed to killing Pendleton and, on May 21, 1990, pled guilty to intentional murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1)), murder in the course of a burglary (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3)), and murder in the course of an armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3)). Pursuant to the trial court's request, the State recited the factual basis for the guilty pleas.

The State began by reciting the proposed testimony of several Troy police officers. The officers would state that they took defendant into custody on February 9, 1990, in connection with a charge unrelated to the instant case. At the time of his arrest, defendant was in possession of an automobile which the arresting officers recognized as belonging to Roy E. Pendleton. Pendleton's ownership of the vehicle was confirmed by the police officers through the Illinois Secretary of State's office. One of the officers proceeded to Pendleton's residence, a room at the Carroll House Inn in Troy, where he discovered Pendleton's body. Pendleton had been tied and gagged and there were three lacerations on his forehead and a butcher knife protruding from his neck. Pendleton's room appeared to have been ransacked.

The State went on to detail several pieces of physical evidence which connected defendant to the murder scene. Fingerprints lifted from the scene by an evidence technician were identified as belonging to defendant. Saliva samples taken from cigarette butts found at the

murder scene were later tested and found to be consistent with defendant's saliva. Finally, a spot of blood found on the pants defendant was wearing at the time of his arrest was analyzed and was found to be consistent with Pendleton's blood and inconsistent with defendant's blood.

The State also referred to the contents of defendant's confession as part of the factual basis for the guilty pleas. As noted, following the discovery of Pendleton's body, defendant was questioned regarding Pendleton's murder by a Troy police officer. Defendant admitted to the killing and gave a videotaped statement detailing his commission of the murder. The statement itself was admitted into evidence at defendant's death penalty hearing. Briefly, defendant's confession described how, on February 8, 1990, defendant gained entry into Pendleton's room under the pretext of using Pendleton's restroom. Defendant went on to state that he ransacked the room for valuables, tied and gagged Pendleton, and placed his hand over Pendleton's nose and mouth, ultimately causing Pendleton to die by asphyxiation. Defendant further described how he cut Pendleton across the forehead and stabbed him in the throat with a butcher knife. Defendant went on to state that, after he was satisfied that Pendleton was dead, he took several of Pendleton's possessions and left in Pendleton's automobile.

The State continued its recitation of the factual basis by referring to the proposed testimony of the pathologist who performed an autopsy on Pendleton's body. According to the pathologist, Pendleton had three lacerations across his forehead, black electrical-type tape over his mouth and nose, and a butcher knife protruding from his throat. The autopsy revealed that Pendleton died as a result of asphyxiation.

The State also referred to evidence that, at the time of defendant's arrest, defendant was in possession of a $500 check made out to Pendleton and the keys to two safe-deposit boxes registered to Pendleton. The State further recited that a bartender at a Livingston, Illinois, bar would testify that, during the time period immediately following the murder of Pendleton, defendant came into the bar, tried to cash a $500 check and bought a round of drinks for the house. This completed the State's recitation of the factual basis for defendant's guilty pleas.

Both before and after the presentation of the factual basis, the trial judge admonished defendant of the effects of his guilty pleas and questioned defendant regarding the voluntariness of his pleas. Following the recitation, defendant agreed that the asserted facts were true and admitted, in response to the judge's query, that he had killed Pendleton. The trial judge accepted defendant's guilty pleas and adjudged defendant guilty of three counts of first degree murder. The judge entered an order to that effect and ordered the preparation of a presentence investigation report on defendant.

A death penalty hearing was commenced on June 27, 1990. Defendant chose to waive his right to jury sentencing and elected to proceed with a bench sentencing hearing. At the start of the eligibility phase of the hearing, the court took judicial notice, on the State's request, of the factual basis presented at the guilty plea hearing. The State then presented the testimony of Linda Van Dyke, an employee of Madison County Probation and Court Services who was assigned to prepare a presentence investigation report on defendant.

Van Dyke testified that, in preparing that report, she interviewed defendant at the Madison County jail. During the interview, Van Dyke asked defendant to explain why he had committed the murder. Defendant responded

that he had been paid to kill Pendleton and that he had killed Pendleton because Pendleton was a "snitch." On cross-examination, Van Dyke testified that defendant did not tell her who had allegedly paid him to commit the murder or where this plan originated. Van Dyke further admitted on cross-examination that defendant gave her no details regarding whom Pendleton had allegedly "snitched" on.

The State next called Robert Joseph Noonan, chief of police for the City of Troy, Illinois. Chief Noonan testified that on May 30, 1990, he received a letter from a person signing as "L.W. Hampton." It was stipulated by the defense that defendant had in fact authored the letter. Chief Noonan stated that, in the letter, defendant referred to Pendleton in a derogatory manner and expressed his lack of remorse for the murder. The letter in question was admitted into evidence following Chief Noonan's testimony.

The State's next witness at the eligibility phase was Officer Thomas Recklein of the Troy police department. Officer Recklein had participated in the February 9, 1990, arrest of defendant. Officer Recklein testified that, at the time of his arrest, defendant was in possession of Pendleton's automobile and several other items belonging to Pendleton. Officer Recklein stated that, following defendant's arrest, Officer Recklein read him his *Miranda* rights and interviewed him. Defendant confessed to the officer and later gave a videotaped confession at the Madison County sheriff's department. Over a defense objection, the trial court allowed the prosecution to play the tape.

In his confession, defendant stated that he came upon Pendleton on February 8, 1990, in the parking lot of the motel in which Pendleton resided. Pendleton was getting into his automobile and defendant asked him for a ride. Pendleton refused and drove away but returned a short

time later and went into his room. Defendant knocked on Pendleton's door and asked if he could enter Pendleton's room in order to use the restroom. Pendleton allowed defendant to enter his room.

Defendant stated that, upon gaining entry to Pendleton's room, he told Pendleton to lie down on his bed. Defendant then began going through Pendleton's belongings. Defendant determined that a suitcase and a microwave oven he found in the room were worth taking and he set those items by the door. Defendant then told Pendleton that he had a choice: he could be tied up and gagged, or he could be killed. Defendant tied Pendleton's wrists and ankles and put tape over his mouth. Defendant stated that he was not convinced that Pendleton could not get loose, so he put tape over Pendleton's nose and put his hand over Pendleton's nose and mouth in an effort to suffocate Pendleton.

Defendant further stated that he "had been told" that a dead body does not bleed, so he cut Pendleton's forehead to determine if he was dead. The wounds bled, so defendant put his hand back over Pendleton's mouth and nose for a few minutes longer. Then, in order to make sure that Pendleton had died this time, defendant stabbed Pendleton in the throat with a knife he found in the room. When he saw that the stab wound did not bleed, defendant put the suitcase and the microwave into Pendleton's automobile and left the scene in the automobile. Defendant drove to a bar in Livingston, Illinois, and bought beer for the house. Defendant then got back into Pendleton's automobile and drove to the truck stop in Troy where he was arrested.

After playing the videotape of defendant's confession, the State presented the testimony of Dee Heil, a crime scene investigator for the Illinois State Police. Heil had investigated the scene of Pendleton's murder and had observed Pendleton's body at the scene. Heil testified

that Pendleton's body was bound with ropes, tape and a nylon dog leash. Pendleton's throat was slashed and a large chef-style knife was protruding from it. Pendleton's forehead had three lacerations and there were what appeared to be burns and cigarette ashes on his eyelids. Heil also described stab holes located in the bed around the perimeter of Pendleton's head.

Heil's testimony ended the State's presentation of evidence at the eligibility phase. The defense presented no evidence. Following closing arguments, the trial court found that the State had proved beyond a reasonable doubt that defendant was over 18 years of age at the time of the murder and that defendant had intentionally murdered Pendleton in the course of a burglary and in the course of an armed robbery. On those bases, the court found defendant eligible for the death penalty pursuant to section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6)). The State had also argued that defendant was eligible based upon his commission of a murder-for-hire. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(5).) The trial court did not find defendant eligible upon that ground. The aggravation and mitigation phase of the death penalty hearing was thereafter commenced.

The State's first witness in aggravation was Deanna Schaefermayer. Schaefermayer described the details of an assault defendant had perpetrated upon her in California in 1987. Following an argument between defendant and Schaefermayer in Schaefermayer's car, defendant hit Schaefermayer and forced her to go into her house with him. Once inside, defendant ordered Schaefermayer to undress and put a leather strap around her neck. Defendant waved a butcher knife in Schaefermayer's face and repeatedly threatened to kill her. The ensuing attack lasted from approximately 1 a.m. until 8:30 a.m., during which time defendant placed

the tip of the knife into Schaefermayer's vagina and plunged the knife into the mattress on which she was lying in close proximity to her face. As a result of this attack, defendant was convicted of assault with a deadly weapon and was imprisoned in California for four years. Schaefermayer testified that she was in counseling for post-trauma stress for approximately one year after the assault. On cross-examination, Schaefermayer admitted that, following defendant's release from prison in California, defendant had no contact with her whatsoever.

Following Schaefermayer's testimony, the court took judicial notice, on the State's request, of the evidence presented at the guilty plea hearing and that presented at the eligibility phase of the death penalty hearing. The State then proceeded to admit into evidence, over a defense objection, certified copies of defendant's prior convictions. This evidence showed that defendant's criminal record included several theft convictions, a robbery conviction, an escape conviction, and an assault with a deadly weapon conviction arising out of the attack on Schaefermayer.

The State then asked the trial court to take judicial notice of the information contained in the presentence report prepared by Linda Van Dyke. The State asked that the court pay particular notice to defendant's criminal history and to the statements made by defendant to Van Dyke. The presentence report contained defendant's statements to Van Dyke to the effect that he had enjoyed killing Pendleton, that he had no remorse for the murder, that he had been violent in the past, that he wanted the death penalty, and that, if he did not receive the death penalty, he would commit further homicides. The court indicated that it would take the requested notice. Following this exchange, the State rested. The trial court inquired whether defendant would be presenting any evidence on his behalf and, after asking for and re-

ceiving a brief recess, defense counsel responded that no evidence would be presented by the defense. Following the arguments of counsel, the court asked defendant if he wished to make a statement. Defendant responded that he wanted to state for the record that, should he be sentenced to death, he wanted no appeals beyond those required by State law. The trial court thereafter returned a verdict finding no mitigating factors sufficient to preclude a sentence of death. An order was entered sentencing defendant to death.

In this appeal, defendant does not contest the validity of his guilty pleas and does not challenge his guilt on the three murder counts. Rather, defendant's contentions of error are directed exclusively toward his sentencing hearing and the propriety of his death sentence.

## I

Defendant first contends that the State failed to prove beyond a reasonable doubt that he was eligible to receive the death penalty. Under the Illinois death sentencing scheme, a defendant is eligible for the death penalty only where, after having been found guilty of first degree murder, he is proved to have been 18 or older at the time of the offense and one or more of the enumerated statutory aggravating factors is shown to be present. (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(b)(1) through (b)(8).) The factors which establish eligibility for the death penalty must be proved by the State beyond a reasonable doubt. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(f).) As noted, the trial court in the instant case found defendant eligible for the death penalty pursuant to section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6)). The version of section 9—1(b)(6) in effect at the time of Pendleton's murder provided that a defendant was eligible for death where it was proved that he committed first degree murder "in

the course of" one of the following felonies: "armed robbery, robbery, aggravated criminal sexual assault, aggravated kidnapping, forcible detention, arson, aggravated arson, burglary, home invasion, calculated criminal drug conspiracy ***, or the attempt to commit any of [these] felonies ***." (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6)(c).) The trial court found that the State had proved beyond a reasonable doubt that defendant had murdered Pendleton in the course of a burglary and in the course of an armed robbery. Defendant argues that neither of these factors was adequately proved.

We first address the validity of defendant's eligibility based upon murder in the course of an armed robbery. Defendant contends that the State failed to prove this factor beyond a reasonable doubt. Defendant's argument focuses on the language "in the course of," and asserts that the evidence failed to prove that Pendleton's murder took place "in the course of" an armed robbery. Defendant points out that Pendleton died by asphyxiation. According to defendant, the evidence demonstrates that he asphyxiated Pendleton, using only his hand, before he was armed with a weapon. The offense of armed robbery, defendant correctly points out, requires proof that the defendant was armed with a dangerous weapon at the time he committed the robbery. (Ill. Rev. Stat. 1989, ch. 38, par. 18—2.) Thus, defendant argues, an armed robbery could not have been taking place at the time he killed Pendleton because he was not armed with a weapon until after he suffocated Pendleton.

We note, parenthetically, that defendant makes no real contention that the evidence did not establish that he committed an armed robbery. However, even if such a contention were made, we would find it to be patently without merit. The offense of armed robbery requires proof that the defendant took property from the presence of another by use or threat of force and while

armed with a dangerous weapon. (Ill. Rev. Stat. 1989, ch. 38, pars. 18—1, 18—2.) In his confession, defendant stated that he began ransacking Pendleton's room and piling Pendleton's valuables by the door prior to killing Pendleton. Defendant further admitted that he ultimately left the room with several of Pendleton's possessions, including Pendleton's automobile. When he was arrested following the murder, defendant was found to be in possession of Pendleton's automobile and several other items belonging to Pendleton. Defendant further confessed that he used a knife during the commission of this crime. Thus, the evidence clearly proved defendant's commission of an armed robbery beyond a reasonable doubt.

Defendant's primary argument on this point, that he did not murder Pendleton "in the course of" an armed robbery, is negated by both the facts and the law. Contrary to defendant's assertions, the evidence does *not* clearly show that defendant was not armed until after he killed Pendleton. In his confession, defendant stated that, after he first blocked Pendleton's nose and mouth, he *cut* Pendleton several times on the forehead. Defendant went on to state that, because those wounds bled, he believed that Pendleton was *still alive,* so he suffocated Pendleton for a few minutes longer. These statements demonstrate that defendant was in possession of, and made use of, a knife while he was in the process of killing Pendleton. Moreover, as noted above, defendant began taking possession of Pendleton's belongings prior to killing Pendleton. Thus, the evidence clearly established that defendant murdered Pendleton "in the course of" his commission of an armed robbery.

Moreover, even if defendant was not in possession of a weapon until after he caused Pendleton's death, his eligibility on this ground would not be rendered defective. This court has repeatedly held that, in order to establish

the aggravating factor of murder in the course of another felony, the State need *not* prove that the commission of the underlying felony had begun when the murder occurred. (*People v. Thomas* (1990), 137 Ill. 2d 500, 534; *People v. Flores* (1989), 128 Ill. 2d 66, 97.) Rather, all that must be proved is that the murder and the other felony were committed either simultaneously or as part of the same criminal episode. (*Thomas*, 137 Ill. 2d at 535.) In *People v. Richardson* (1988), 123 Ill. 2d 322, this court declined to reverse a finding of eligibility predicated on murder in the course of an armed robbery where the defendant argued that there was no evidence that an armed robbery had commenced prior to the fatal gunshot. The *Richardson* court reasoned:

"Just as the phrase 'in the course of' does not require that defendant complete one of the other felonies in order to be eligible for the death sentence [citation], we also believe that it does not require that the armed robbery commence prior to the fatal gunshot, since the precise timing of the offenses is not necessarily indicative of defendant's intent. The jury concluded beyond a reasonable doubt that defendant committed both a murder and an armed robbery, which offenses occurred essentially simultaneously. The trial testimony and verdicts sufficiently support the court's finding that the murder occurred 'in the course of' an armed robbery." (*Richardson*, 123 Ill. 2d at 359.)

Clearly, defendant's perpetration of the murder and armed robbery of Pendleton occurred either simultaneously or as part of the same criminal episode. (See *Thomas*, 137 Ill. 2d at 535.) Thus, defendant's eligibility based upon murder in the course of an armed robbery was proved beyond a reasonable doubt.

Defendant also challenges the trial court's finding that he was eligible for death on the ground that he murdered Pendleton in the course of a burglary. Defendant argues that the crime he committed in entering

Pendleton's room did not constitute burglary (Ill. Rev. Stat. 1989, ch. 38, par. 19—1), but rather constituted *residential* burglary (Ill. Rev. Stat. 1989, ch. 38, par. 19—3), because the room at the Carroll House Inn was Pendleton's residence. As outlined above, the version of section 9—1(b)(6) in effect in February 1990, while including burglary on the list of underlying felonies which would support a death sentence, did *not* include residential burglary on that list. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6).) Defendant points out that this court has previously vacated death sentences governed by that version of the statute where eligibility was predicated on the defendant's commission of a murder in the course of a residential burglary. See *People v. Simms* (1991), 143 Ill. 2d 154; *People v. Chandler* (1989), 129 Ill. 2d 233.

We need not determine whether defendant's eligibility based upon murder in the course of a burglary is subject to attack on the ground herein advanced. We have found that defendant was independently eligible for the death penalty on the ground that he committed murder in the course of an armed robbery. Thus, even if we were to conclude that defendant's eligibility was improperly premised on murder in the course of a burglary—and we do not make any such finding—the validity of defendant's eligibility would not be impaired because a separate, valid aggravating factor supported his eligibility. (See *Zant v. Stephens* (1983), 462 U.S. 862, 880-90, 77 L. Ed. 2d 235, 252-58, 103 S. Ct. 2733, 2744-50; *People v. Terrell* (1989), 132 Ill. 2d 178, 225; *People v. Coleman* (1989), 129 Ill. 2d 321, 343.) The Illinois death penalty statute does not place special emphasis on any one aggravating factor and does not accord any special significance to multiple aggravating factors as opposed to a single aggravating factor. The finding of a statutory aggravating factor at the eligibility phase serves the purpose of narrowing the class of persons convicted of mur-

der who are eligible for death; once one such factor is proved, the defendant is eligible for death regardless of whether other factors exist as well. (*Coleman*, 129 Ill. 2d at 345-46.) We have concluded that defendant was properly found eligible for the death penalty based upon murder in the course of an armed robbery. Thus, the possible impropriety in finding defendant eligible based upon murder in the course of a burglary would not affect his eligibility.

Defendant however argues that his death sentence must be vacated and the cause remanded for resentencing if either of the two aggravating factors upon which he was found eligible for the death penalty is invalid. Defendant cites this court's decision in *People v. Brownell* (1980), 79 Ill. 2d 508, as support for this contention. In *Brownell*, this court concluded that a new sentencing hearing was required because this court had found defective one of the two aggravating factors upon which the defendant's eligibility was premised. (*Brownell*, 79 Ill. 2d at 535-36.) In that case, the defendant was convicted of murder, aggravated kidnapping and rape and was found eligible for death on the basis of two aggravating factors: (1) the victim was killed in the course of a felony (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6)); and (2) the victim was killed because, as the victim of the aggravated kidnapping and rape, she could later have testified as an eyewitness against the defendant (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(7)). On appeal, this court determined that the defendant was properly found eligible under the first factor, but that the second factor was not warranted by the evidence, because section 9—1(b)(7) was intended to be limited to situations where a witness to a previous offense is killed in order to stymie the investigation. (*Brownell*, 79 Ill. 2d at 525-26.) This court went on to conclude that a new sentencing hearing was required because the sentencing

body could have considered, in weighing the aggravating and mitigating factors at the second phase of the hearing, an aggravating factor which this court had determined did not exist. *Brownell*, 79 Ill. 2d at 535-36.

*Brownell* would not require resentencing in the case at bar were the burglary—based aggravating factor invalidated. In that case, resentencing was mandated because, at the second phase of the sentencing hearing, the sentencing body could have considered an aggravating factor which was not warranted by the evidence; that is, the evidence did not show that the defendant had killed in order to silence a witness, yet the sentencer could have weighed that factor in making its sentencing determination. In the instant case, even if the burglary-based aggravating factor were not sufficient to render defendant eligible for the death penalty, the evidence *did* establish that defendant had engaged in conduct which constituted either burglary or residential burglary. The trial judge was therefore still fully entitled to consider the evidence underlying that factor in making his sentencing determination. (See *Coleman*, 129 Ill. 2d at 346-47; *People v. Emerson* (1987), 122 Ill. 2d 411, 445.) Thus, even if the offense defendant committed was murder in the course of a *residential* burglary, while that factor would not be sufficient to establish defendant's eligibility, the fact of defendant's commission of that crime could properly be considered at the second phase of the sentencing hearing. (*People v. Jackson* (1991), 145 Ill. 2d 43, 117-18 (although the defendant's commission of residential burglary was not a proper predicate felony for eligibility, the defendant's conduct in committing that crime could properly be considered at the aggravation—mitigation phase).) We therefore hold that defendant's eligibility for the death penalty was proved beyond a reasonable doubt.

## II

Defendant next challenges the admission of certain evidence at both phases of his death penalty hearing. Defendant asserts that his death sentence must be vacated because irrelevant and prejudicial evidence was introduced at the eligibility phase and statements obtained in violation of his fifth amendment and sixth amendment rights were admitted at both the eligibility phase and the aggravation-mitigation phase. We first address defendant's contention that irrelevant and prejudicial evidence was admitted at the eligibility phase.

Defendant challenges the admission, at the eligibility phase of his death penalty hearing, of certain testimony from Troy Chief of Police Robert Noonan. As noted, Chief Noonan testified about the contents of a letter he received from defendant on May 30, 1990. The State asked Chief Noonan to give his opinion, based upon the letter, as to whether defendant had any remorse for the murder of Pendleton. Chief Noonan responded by stating, "Didn't indicate to me that he had remorse. He made a statement here, he said, there is only one regret I have about killing that worthless piece of shit, I wish I had cut his fucking head off." Chief Noonan also testified that, in the letter, defendant referred to the victim by stating, "the rotten bastard was a snitch." Defendant did not object to any of these statements and the letter was admitted into evidence without objection. Defendant charges that the police chief's testimony regarding defendant's lack of remorse and his derogatory references to Pendleton were irrelevant to the issue of defendant's eligibility and were highly prejudicial.

Our review of the record indicates that defendant has waived any error in the introduction of this testimony. Defendant failed to object to the complained-of comments at the sentencing hearing and failed to raise the

issue in his post-sentencing motion. Such failure results in a waiver of the issue on review. (*People v. Guest* (1986), 115 Ill. 2d 72, 109; *People v. Szabo* (1986), 113 Ill. 2d 83, 93.) Defendant urges us to consider the issue under the "plain error" exception to the waiver rule under which an otherwise waived error may be considered because the evidence is closely balanced or the alleged error is so substantial as to deprive defendant of a fair trial. (*People v. Walker* (1985), 109 Ill. 2d 484, 504.) In the instant case, the fact that defendant was over 18 at the time of the murder and that he murdered Pendleton in the course of an armed robbery were established by overwhelming evidence, including defendant's own confession. We find that the possible impropriety in admitting the challenged testimony of Chief Noonan was not sufficiently grave to warrant invocation of the plain error exception to the waiver rule in light of the overwhelming evidence of eligibility. See *Walker*, 109 Ill. 2d at 504-05 (possible error in admitting, at the eligibility phase, unobjected-to testimony that the defendant did not express any remorse was not saved from waiver by the plain error exception because the evidence of the defendant's eligibility was overwhelming).

Moreover, we note that defendant's sentencing hearing was conducted before the trial judge, not a jury. In such a case, there exists a presumption that the judge considered only competent and relevant evidence. (*People v. Shum* (1987), 117 Ill. 2d 317, 367; *Guest*, 115 Ill. 2d at 108.) There is no indication in the record before us that the trial judge considered the possibly improper testimony of Chief Noonan in making his determination that defendant was eligible for the death penalty. (See *Shum*, 117 Ill. 2d at 367.) We thus find no reversible error was committed in the admission of the challenged testimony of Chief Noonan.

Defendant next contends that statements obtained in violation of his fifth amendment and sixth amendment rights were improperly admitted at both the eligibility and the aggravation-mitigation phases of his death penalty hearing. Following the acceptance of defendant's guilty pleas, a presentence investigation report on defendant was ordered by the court. As noted, Linda Van Dyke, a probation officer, interviewed defendant in the course of preparing that report. Van Dyke was called to testify for the State at the eligibility phase of defendant's death penalty hearing.

Van Dyke testified that defendant stated to her during the interview that he had been hired to kill Pendleton and that he had killed Pendleton because he had been told that Pendleton was a "snitch." The State referred to this testimony in its opening and closing statements at the eligibility phase in arguing that defendant was eligible for death on the additional basis of having committed a murder-for-hire (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(5)).

At the aggravation-mitigation phase of the death penalty hearing, the State requested that the court take judicial notice of the contents of the presentence report prepared by Van Dyke and to pay particular notice to defendant's statements contained therein. The court indicated that it would do so. The State thereafter referred to some of these statements in its closing argument at the aggravation-mitigation phase.

Defendant argues that the introduction of his statements to Van Dyke violated his fifth amendment privilege against self-incrimination and his sixth amendment right to the assistance of counsel. (U.S. Const., amends. V, VI.) We briefly note that defendant also contends that the admission of Van Dyke's testimony at the eligibility phase violated "the rules of evidence" governing that phase. Defendant apparently argues that the testimony

was irrelevant to the issue of his eligibility; however, defendant provides no reasoning or authority to support this contention and we find nothing in the record which shows that the rules of evidence were violated. At the eligibility phase, Van Dyke testified only in regard to defendant's statements about killing Pendleton pursuant to a contract. Such testimony was relevant to the question of whether defendant was eligible for death based upon the murder-for-hire statutory aggravating factor (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(5)). Thus, defendant's assertion that Van Dyke's testimony at the eligibility phase violated the rules of evidence is meritless.

We now turn to defendant's constitutional contentions. Defendant contends that his rights under the fifth and sixth amendments were infringed when probation officer Van Dyke questioned defendant about the murder while defendant was incarcerated and while he was represented by counsel. Defendant asserts that he continued to possess the right to remain silent and the right to the assistance of counsel at the time of the interview with Van Dyke and that these rights were violated. Beyond these assertions, however, defendant provides almost no elaboration as to how these constitutional rights were infringed. Defendant does cite to the United States Supreme Court's decision in *Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866. In *Estelle*, the Supreme Court vacated a Texas defendant's death sentence on the ground that his fifth amendment and sixth amendment rights had been violated by the introduction of certain testimony at his death penalty hearing. Therein, the defendant, awaiting trial for murder, was ordered by the trial court to submit to a pretrial examination by a psychiatrist for the purpose of determining his competency to stand trial. The defendant was interviewed by the psychiatrist and the psychiatrist

informed the court that the defendant was competent to stand trial. The trial commenced and the defendant was convicted of murder. Thereafter, at the defendant's death penalty hearing, the State called the psychiatrist as its only witness. Over a defense objection that the psychiatrist had not been included on the State's witness list, the psychiatrist was allowed to testify and give his opinion that the defendant would continue to be dangerous in the future. Under Texas law, the question of a capital defendant's "future dangerousness" was one of three requisite questions which, if answered in the affirmative by the sentencing body, resulted in the mandatory imposition of the death penalty. The sentencing jury in *Estelle* answered the three requisite questions in the affirmative and sentenced the defendant to death. *Estelle*, 451 U.S. at 460, 68 L. Ed. 2d at 367, 101 S. Ct. at 1871.

The Supreme Court in *Estelle* held that the introduction of the psychiatrist's testimony at the death penalty hearing violated the defendant's rights under the fifth and sixth amendments. The Court initially determined that the fifth amendment privilege against self-incrimination and the sixth amendment right to the assistance of counsel continue to apply at the penalty phase of a capital murder trial. (*Estelle*, 451 U.S. at 463, 68 L. Ed. 2d at 369, 101 S. Ct. at 1873.) Addressing the defendant's claim of a fifth amendment violation, the Court concluded that the effectuation of the privilege in the situation before it required that the defendant be given *Miranda* warnings prior to the interview with the psychiatrist. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) The Court reasoned that, in that situation, the psychiatrist was acting as an agent of the State eliciting statements from a defendant in a post-arrest custodial setting, yet the defendant was given no indication that the compulsory examination

would be used to gather evidence necessary to sentence him to death. Therefore, the fifth amendment required that the defendant be informed of his right to remain silent and be advised of the possible use of his statements. The Court held that, because the defendant was afforded no such warnings, his death sentence could not stand. *Estelle*, 451 U.S. at 469, 68 L. Ed. 2d at 373, 101 S. Ct. at 1876.

The *Estelle* Court also held that the introduction of the psychiatrist's testimony at the death penalty hearing violated the defendant's sixth amendment right to the assistance of counsel. The Court determined that the interview with the psychiatrist was a critical stage of the criminal proceedings against the defendant. The Court went on to hold that the defendant's sixth amendment right to counsel had been violated because the defendant's attorneys were not notified in advance that the psychiatric examination would encompass the critical issue of the defendant's future dangerousness. As a result, the defendant was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be used. *Estelle*, 451 U.S. at 471, 68 L. Ed. 2d at 374, 101 S. Ct. at 1877.

As noted, defendant herein argues that Van Dyke's questioning of him for the presentence report violated his fifth amendment and sixth amendment rights. Again, we note that, beyond these assertions, defendant does not provide us with any explanation as to how these rights were violated. However, in light of defendant's citation to *Estelle*, we surmise that defendant is arguing that *Estelle* requires *Miranda* warnings and prior notice to defense counsel when a probation officer interviews a defendant for a presentence report, at least where the information ascertained at the interview may be used against the defendant at a capital sentencing hearing.

This court has not yet decided whether, under *Estelle,* *Miranda* warnings are required where a probation officer interviews a defendant pursuant to a court-ordered presentence investigation. However, we find that the instant case is not the proper vehicle for addressing this potentially significant issue, for the following reasons. In *People v. Devin* (1982), 93 Ill. 2d 326, 344, this court held that the failure to object at trial waived review of the defendant's claim that *Estelle* was violated when a psychiatrist testified, at the defendant's death penalty hearing, about statements the defendant had made during a fitness examination. Defendant in the instant case has likewise waived his claim that, under the authority of *Estelle,* his fifth amendment rights were violated. Defendant made no motion to suppress his statements to Van Dyke prior to the sentencing hearing. In addition, defendant· did not object at the hearing to either Van Dyke's testimony or the trial court's consideration of the presentence report. We note that, at the commencement of the sentencing hearing, the trial court referred to the presentence investigation report, asking defense counsel if he had received the report and if he had any problems with the report. The defense made no objection to the report at that time. Further, defendant did not challenge the admission of this evidence in his post-sentencing motion. It is well established that, even at a capital sentencing hearing, such failures result in a waiver of the issue on review. *Szabo,* 113 Ill. 2d at 93.

The logic behind the waiver rule is exemplified by this case. Had defendant moved to suppress his statements or objected on fifth amendment grounds in a timely manner at the sentencing hearing, inquiry could have been made into whether he was in fact given *Miranda* warnings by Van Dyke. As it stands, there is no indication in the record as to whether or not Van Dyke gave defendant *Miranda* warnings prior to the in-

terview. Likewise, had the issue been raised in defendant's post-sentencing motion, the trial court could have conducted a hearing at which it could have been determined whether *Miranda* warnings were given. Thus, defendant's failure to adequately preserve the issue has left this court with a record completely barren of any indication as to whether defendant was or was not given *Miranda* warnings prior to being interviewed by Van Dyke. Significantly, defendant nowhere states in his brief that he was *not* given *Miranda* warnings by Van Dyke. Defendant has therefore waived the issue, and we need not decide whether *Miranda* warnings are required where a probation officer interviews a defendant pursuant to a court-ordered presentence investigation. See *People v. Coleman* (1989), 129 Ill. 2d 321, 340 (failure to raise alleged *Miranda* violation in motion to suppress or to object on that ground at trial waived the issue on review); *People v. Lang* (1986), 113 Ill. 2d 407, 469 (failure to raise argument in the trial court that fifth amendment privilege should apply to psychiatric examinations conducted for the purpose of testifying at involuntary-admission proceedings resulted in waiver of issue on appeal); see also *People v. Free* (1983), 94 Ill. 2d 378, 425.

Contrary to defendant's urgings, the plain error exception to the waiver rule does not save the issue in this case. Plain error is a " 'narrow and limited exception to the general waiver rule.' " (*Szabo*, 113 Ill. 2d at 94, quoting *People v. Pastorino* (1982), 91 Ill. 2d 178, 188.) The exception is to be invoked only where the evidence is closely balanced or the alleged error is so substantial that it deprived the defendant of a fair hearing. (*Walker*, 109 Ill. 2d at 504.) Were it otherwise, defense counsel could secure a reversal simply by intentionally failing to object and, by design, depriving the trial court of the opportunity to prevent or correct the error. (*People v. Herrett* (1990), 137 Ill. 2d 195, 215.) In the instant case, we

find that neither prong of the plain error exception is satisfied.

The evidence presented at the eligibility phase of defendant's death penalty hearing was not closely balanced, as it was clearly established that defendant was eligible based upon murder in the course of an armed robbery. Neither was the evidence introduced at the aggravation-mitigation phase closely balanced. To the contrary, overwhelming aggravating evidence was presented. The State presented defendant's extensive criminal record, which record demonstrated an increasingly violent history of offenses. The State further proffered the testimony of Deanna Schaefermayer, who detailed a brutal attack perpetrated upon her by defendant in 1987. Defendant's complete lack of remorse for the murder of Pendleton was also plainly evidenced. Defendant's letter to Chief Noonan, while possibly improperly admitted at the eligibility phase, was properly considered at the aggravation-mitigation phase. (See *People v. Barrow* (1989), 133 Ill. 2d 226, 281.) In the letter, defendant called Pendleton a "rotten bastard," a "snitch," and a "worthless piece of shit," ridiculed the police because they purportedly "had him" and let him go before he killed Pendleton, and stated that his only regret in killing Pendleton was that he had not cut Pendleton's head off. Again, in his videotaped confession, defendant demonstrated his utter lack of remorse, as well as the brutality of his conduct in committing the murder. In that confession, defendant describes how he gave Pendleton the "choice" of being tied and gagged or being killed, and then described how, despite Pendleton's submission to being restrained, he savagely murdered him anyway. Defendant also relates how, immediately following the murder, he drove to a bar, played a few songs, and bought a round of drinks for the house. In addition, the testimony of the crime scene investigator, Dee Heil, de-

scribing burn marks and cigarette ashes on Pendleton's eyelids and stab holes around Pendleton's head, revealed further evidence of the extreme brutality of defendant's crime. In light of this overwhelming aggravating evidence, we do not believe that any possible *Miranda* violation in admitting defendant's statements to Van Dyke could have improperly skewed the sentencing scales. See *People v. Stewart* (1984), 104 Ill. 2d 463, 488 (no plain error in allegedly improper prosecutorial comment on the defendant's silence because the evidence against the defendant was "formidable and highly persuasive").

Neither was the claimed error so substantial that defendant was thereby denied a fair sentencing hearing. (*People v. Carlson* (1980), 79 Ill. 2d 564, 577.) This second prong of the plain error exception is to be invoked only where the possible error is so serious that its consideration is "necessary to preserve the integrity and reputation of the judicial process." (*Herrett*, 137 Ill. 2d at 214.) The alleged error in the instant case is not of such a character.

Initially, we note that it is extremely unclear whether or not defendant was given *Miranda* warnings by Van Dyke. We find it very significant that defendant *nowhere* states in his briefs to this court that he was not given *Miranda* warnings by Van Dyke. The plain error exception will be invoked only where the record *clearly* shows that an alleged error affecting substantial rights was committed. (*People v. Young* (1989), 128 Ill. 2d 1, 46.) We find it difficult to hold that we must consider an otherwise waived allegation that *Miranda* rights were violated where the party so alleging does not even make the threshold claim that he was not given *Miranda* warnings.

Further, it is apparent from a reading of defendant's statements in the presentence report that he was aware that the information he gave to Van Dyke would be used

to determine whether he should be sentenced to death. The report indicates that, when Van Dyke asked defendant about his family and background, defendant cautioned her that he did not want any of the information he was going to give her used as mitigation. The report also states that defendant told Van Dyke throughout the course of the interview that he did not want any of the information he gave to be "perceived" as mitigating. Finally, the report relates that defendant stated to Van Dyke that he wanted "the Court to understand" that he deserves the death penalty. These comments by defendant indicate that defendant was clearly aware that his statements to Van Dyke were to be related to the sentencing judge and were to be considered by the judge in sentencing defendant. That defendant was aware of this is underscored by the fact that the interview to which defendant was submitting, a *presentence* investigation interview, was obviously being conducted for the purpose of obtaining information to be used in sentencing defendant. Defendant was thus clearly aware of the purpose of his interview with Van Dyke and of the intended use of the information obtained by Van Dyke. In light of this, it cannot reasonably be contended that the record clearly shows that an error affecting substantial rights was committed.

Moreover, the alleged error complained of, the failure to provide *Miranda* warnings, is not an error of constitutional magnitude. We note that no contention is made by defendant that his statements were in any way compelled, coerced or otherwise rendered involuntary so as to have violated defendant's privilege under the fifth amendment against compelled self-incrimination. Rather, defendant's claim of error rests upon an alleged violation of his claimed right to warnings under *Miranda*. The United States Supreme Court has held that the *Miranda* holding sweeps more broadly than the fifth amendment,

and that the " 'prophylactic *Miranda* warnings \*\*\* are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." ' " (*Oregon v. Elstad* (1985), 470 U.S. 298, 305, 84 L. Ed. 2d 222, 229-30, 105 S. Ct. 1285, 1291 (quoting *New York v. Quarles* (1984), 467 U.S. 649, 654, 81 L. Ed. 2d 550, 556, 104 S. Ct. 2626, 2630, quoting *Michigan v. Tucker* (1974), 417 U.S. 433, 444, 41 L. Ed. 2d 182, 192, 94 S. Ct. 2357, 2364).) Thus, the possibility that defendant's statements were improperly obtained without *Miranda* warnings did not infringe upon defendant's *constitutional* rights.

This court has previously declined to apply the plain error exception to allegations that a defendant's fifth amendment rights were violated by the prosecutor's improperly commenting on a defendant's post-arrest silence (*Herrett*, 137 Ill. 2d at 215-16; *Stewart*, 104 Ill. 2d at 488; *People v. Lucas* (1981), 88 Ill. 2d 245, 252) or by the prosecutor's reference to a defendant's failure to testify (*People v. Whitehead* (1987), 116 Ill. 2d 425, 448). Unlike the claim of error in the instant case, such allegations clearly implicated *constitutional* rights possessed by the defendants, yet the errors were not found to be of such magnitude that they clearly deprived the defendants of fair trials. Similarly, courts of this state have declined to review as plain error allegations that a defendant's confession was involuntary (*People v. Byrd* (1986), 139 Ill. App. 3d 859, 864; *People v. Conley* (1983), 118 Ill. App. 3d 123, 131), as well as a claim that a defendant's confession was "not the product of a rational mind or a free will" (*People v. Gacy* (1984), 103 Ill. 2d 1, 28). Finally, several Federal courts have found that an allegation that statements were obtained in violation of *Miranda* was not saved by the plain error rule. (See, *e.g.*, *United States v. Colon* (2d Cir. 1990), 905 F.2d 580,

588.) We likewise conclude that the alleged error in the case at bar is not of such character that the second prong of the plain error exception must be invoked.

Defendant also argues that the admission of his statements to Van Dyke violated his sixth amendment right to the assistance of counsel. Like his claim of a *Miranda* violation, defendant's claim of a sixth amendment violation has been waived by his failure to raise the issue in the trial court. (*Szabo*, 113 Ill. 2d at 93.) However, even if we were to consider this issue, we would find no infringement of defendant's sixth amendment right to counsel.

As noted, in *Estelle*, the United States Supreme Court held that the defendant's sixth amendment right to counsel was violated because the defendant's lawyers were not notified in advance that the psychiatric examination of their client would be used to obtain information to be used against him at his death penalty hearing. As a result, the *Estelle* Court determined, the defendant was deprived of the right to consult with his counsel regarding "whether to submit to the examination and to what end the psychiatrist's findings could be employed." (*Estelle*, 451 U.S. at 471, 68 L. Ed. 2d at 374, 101 S. Ct. at 1877.) The *Estelle* Court expressly noted that it was not holding that the defendant had a constitutional right to have counsel actually *present* at the examination. (*Estelle*, 451 U.S. at 470 n.14, 68 L. Ed. 2d at 374 n.14, 101 S. Ct. at 1877 n.14.) Rather, the Court's decision was premised upon the fact that the defendant was deprived of the meaningful assistance of counsel *prior* to the examination because his counsel was not notified of the examination's intended scope. Thus, the *Estelle* defendant's rights were violated because his attorneys were not able to adequately advise him prior to the examination. *Estelle*, 451 U.S. at 471, 68 L. Ed. 2d at 374, 101 S. Ct. at 1877.

The circumstances that led the *Estelle* Court to find a sixth amendment violation are not present in the case at bar. Defendant does not claim, and the record does not indicate, that defendant's attorneys were not notified in advance that he would be interviewed in the course of the presentence investigation. The presentence investigation was formally ordered by the trial court on May 22, 1990, and the interview took place in early June of 1990. Defendant does not contend that his attorneys were unaware of the court's May 22, 1990, order, and the record would not support such a contention. When the trial judge, at the beginning of the sentencing hearing, referred to the presentence report and asked counsel if they had received copies, defense counsel expressed no surprise and registered no complaint that they had not been notified of the investigation or the interview.

Likewise, defendant does not assert that his attorneys were unaware of the purpose and scope of the interview. In *Estelle*, the psychiatric examination was ostensibly conducted for the limited purpose of determining the defendant's competency to stand trial and the defendant's lawyers were not made aware that any other purpose for the examination existed. (*Estelle*, 451 U.S. at 470-71, 68 L. Ed. 2d at 374, 101 S. Ct. at 1877.) In the instant case, there is no indication that defendant's attorneys were not aware that the purpose of a *presentence* investigation interview would be to obtain information to be used in sentencing defendant. Again, defense counsel expressed no surprise and made no objection when asked about the report at the commencement of the hearing. Neither does defendant claim that his attorneys tried to attend the interview and were excluded, or that he requested their presence and was denied it. Moreover, defendant does not assert that he was *forced* to proceed with the interview without the presence of counsel.

Thus, the situation that led the *Estelle* Court to find an abridgement of the right to counsel is not present in this case. There is no indication in this record that defendant was deprived of the meaningful advice of his counsel prior to the interview or that he was forced to proceed with the interview after requesting and being denied counsel. We therefore find that Van Dyke's presentence interview did not violate defendant's sixth amendment right to the assistance of counsel. See *United States v. Cortes* (2d Cir. 1990), 922 F.2d 123, 128 (presentence interview with probation officer did not violate the defendant's sixth amendment right to counsel because there was no claim that defense counsel was excluded from the interview or that the defendant was forced to proceed with the interview without counsel); *United States v. Saenz* (6th Cir. 1990), 915 F.2d 1046, 1049 (presentence interview with probation officer did not violate defendant's right to counsel because there was no indication that defense counsel was not informed of or was excluded from the interview).

### III

Defendant next contends that his trial counsel's conduct at his death penalty hearing rendered his death sentence unconstitutionally unreliable. Defendant claims that defense counsel failed to present evidence in mitigation, failed to object to allegedly improper aggravation evidence, and failed to deliver an adequate argument in favor of a sentence other than death. According to defendant, these alleged failures on counsel's part rendered his sentence unconstitutionally unreliable because the prosecution's case was not subjected to "meaningful adversarial testing."

Defendant's claim that his counsel failed to subject the State's case to "meaningful adversarial testing" is, while defendant does not term it as such, a claim that he

received ineffective assistance of counsel under the sixth amendment (U.S. Const., amend. VI). In *United States v. Cronic* (1984), 466 U.S. 648, 656, 80 L. Ed. 2d 657, 666, 104 S. Ct. 2039, 2045, the United States Supreme Court determined that an accused's sixth amendment right to the effective assistance of counsel is "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." Therefore, we will address defendant's contention under the principles set out by the Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, for resolving claims of ineffective assistance of counsel.

In *Strickland*, the Supreme Court established a two-pronged test for evaluating criminal defendants' claims of ineffective assistance of counsel under the sixth amendment. Under that test, a defendant asserting such a claim must first show that his counsel's performance was deficient. To establish this prong, the defendant must prove that his counsel made errors so serious, and his performance was so deficient, that he was not functioning as the "counsel" guaranteed by the sixth amendment. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) Counsel's performance in this regard is to be measured by an objective standard of reasonableness under prevailing professional norms. (*Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2065.) Second, the defendant must prove that he was prejudiced by his counsel's deficient performance. This requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) In some circumstances, counsel's incompetence may be of such magnitude that prejudice to the defendant may be presumed, and the defendant's burden

of proving prejudice will be dispensed with. (*Cronic*, 466 U.S. at 658, 80 L. Ed. 2d at 667, 104 S. Ct. at 2046; see also *People v. Hattery* (1985), 109 Ill. 2d 449, 461.) However, apart from cases of that gravity, the defendant must generally show how specific errors by his counsel undermined the reliability of the verdict. (*Cronic*, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047.) In the context of a death sentencing hearing, the defendant must prove that counsel's representation was deficient and that there is a reasonable probability that, but for counsel's deficient conduct, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.

It is not a reviewing court's place to lightly second-guess trial counsel's judgment. Thus, when reviewing a claim of ineffective assistance, this court must accord much deference to defense counsel's judgment and must indulge a strong presumption that counsel's conduct "falls within the wide range of reasonable professional assistance." (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) As the Supreme Court warned in *Strickland*, "[i]ntensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." (*Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.) Applying these standards to the instant case, we find that defendant has failed to demonstrate that his trial counsel was ineffective under the sixth amendment.

Defendant first faults his trial counsel's conduct in allegedly failing to present evidence in mitigation at defendant's death penalty hearing. We begin by noting that this court has repeatedly held that defense counsel's

failure to introduce mitigation evidence at a death penalty hearing does not necessarily constitute ineffective assistance of counsel. (*People v. Emerson* (1987), 122 Ill. 2d 411, 439; *People v. Orange* (1988), 121 Ill. 2d 364, 389; *People v. Shum* (1987), 117 Ill. 2d 317, 370.) The rationale for these holdings is that mitigating factors can be found in *any* evidence produced at trial or at sentencing, even when the defense presents no evidence of its own. (*People v. Johnson* (1986), 114 Ill. 2d 170, 207.) In the instant case, mitigating evidence *was* introduced at defendant's sentencing hearing, though not by the defense. The presentence investigation report prepared by probation officer Van Dyke contained mitigating information provided by defendant regarding his family and background. The report related that defendant's father had beaten his mother on a regular basis until defendant's mother eventually left the family when defendant was six or seven years old. The report further described how defendant's father then began beating defendant and his sister until, at age 10, defendant began running away. According to the report, defendant spent the next several years in and out of orphan homes and detention centers until, at age 15, defendant left home permanently. In addition, the report related that defendant had seen his father rape his sister when she was 13 years old. The presentence report was introduced at the sentencing hearing and defense counsel cannot be faulted for failing to introduce mitigating evidence that was already contained in that report. (*People v. Neal* (1985), 111 Ill. 2d 180, 198-99.) We note that defense counsel referred to the mitigating evidence in the report during his closing argument at the second phase of the sentencing hearing. Thus, some mitigation evidence was introduced at defendant's sentencing hearing and was presumably considered by the sentencing judge.

Moreover, defendant's claim must fail because defendant points to no mitigating evidence which could have been introduced by defense counsel at the sentencing hearing but was not. (*Emerson*, 122 Ill. 2d at 439; *Orange*, 121 Ill. 2d at 389-90.) Neither does defendant assert that his counsel failed to adequately investigate leads to potential mitigating evidence. Given defendant's reluctance, as evidenced in the presentence report, to provide any information regarding his family or background to Van Dyke, it is reasonable to assume that defendant was equally as reluctant to provide such information to his trial counsel. Further, the information defendant did give to Van Dyke was very general in nature; defendant expressly declined to name any family members. Thus, there is no indication that defense counsel failed to present available mitigating evidence or failed to follow up any leads to mitigating evidence. We therefore find that defendant has failed to prove that his counsel was incompetent for failing to introduce any mitigation evidence beyond that contained in the presentence report.

Moreover, even if counsel's conduct on this point could be deemed unreasonable, defendant has not shown that this alleged deficiency affected the outcome of the proceeding. As noted in our discussion of the preceding issue, the evidence presented by the State in aggravation was overwhelming. Given this fact, and the fact that defendant has failed to bring to our attention any additional mitigating evidence that could have been presented, we find that defendant has not demonstrated how his counsel's conduct could have affected the outcome of the proceeding.

Defendant also claims that his counsel's ineffectiveness was demonstrated by counsel's failure to object to the admission of defendant's statements to Van Dyke. Although defendant again fails to provide any explana-

tion as to why this evidence was improperly admitted, he is apparently referring to the alleged fifth amendment and sixth amendment violations discussed in the preceding issue. As stated, we have found no sixth amendment violation in the introduction of defendant's statements to Van Dyke and an ineffectiveness claim based upon failing to object on that ground is thus meritless. We have also found that the contention that the statements were obtained in violation of defendant's *Miranda* rights has been waived by defendant's failure to raise the issue in the trial court. We now conclude that defendant has not proved that his counsel was unconstitutionally ineffective in failing to object on *Miranda* grounds in the trial court.

As noted, the burden is on the defendant seeking to assert an ineffective assistance claim to prove that his counsel was incompetent and to prove that this incompetence affected the outcome of the proceeding. (*Strickland,* 466 U.S. at 693, 80 L. Ed. 2d at 697, 104 S. Ct. at 2067; *People v. Gacy* (1988), 125 Ill. 2d 117, 126.) To sustain this burden, the defendant must overcome a "strong presumption" that his counsel's conduct "[fell] within the wide range of reasonable professional assistance." (*Strickland,* 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065; see also *Gacy,* 125 Ill. 2d at 125.) Defendant in the case at bar has not met this burden. As we discussed in detail in the preceding issue, it is impossible for this court to determine whether or not defendant was given *Miranda* warnings by Van Dyke. Defendant can point to nothing in the record that supports the contention that no such warnings were given. Moreover, defendant does not even *state* in his briefs to this court that he was not given *Miranda* warnings by Van Dyke. Defendant cannot show that his counsel was incompetent for failing to challenge the admission of defendant's statements on *Miranda* grounds when defendant does

not even *assert* that a *Miranda* violation occurred. The burden of proving his counsel's incompetence is on defendant and defendant has not sustained that burden.

Furthermore, defendant has not proved that the failure to object to these statements affected the outcome of the sentencing proceedings. To sustain this burden, defendant is required to show that there is a reasonable probability that, had defense counsel objected, defendant's statements would have been excluded and the sentencing judge would ultimately have concluded that the balance of aggravating and mitigating factors did not warrant death. (*Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.) However, in light of the fact that defendant does not even claim that no *Miranda* warnings were given, this court cannot find that a "reasonable probability" exists that an objection based upon the failure to give *Miranda* warnings would have been successful. See *People v. Mack* (1984), 105 Ill. 2d 103, 131 (no ineffective assistance because the defendant alleged only that counsel's errors "could have" affected the outcome of the proceeding; such allegation did not establish the required "reasonable probability"); see also *Gacy*, 125 Ill. 2d at 129-30.

We note also that defense counsel's decision not to object to the admission of defendant's statements in the presentence report could have been deliberate trial strategy. As noted, the presentence report contained statements by defendant that constituted valuable mitigating evidence as well as statements that reflected adversely upon defendant. Defense counsel could reasonably have concluded that the value of the mitigation contained in the report merited allowing the report to be introduced. It is well established that errors in trial strategy and judgment do not establish incompetence. (*People v. Madej* (1985), 106 Ill. 2d 201, 214; see also *Gacy*, 125 Ill. 2d at 126.) Thus, defendant has not shown that his trial

counsel's failure to object to the admission of defendant's statements to Van Dyke constituted constitutionally ineffective representation.

Defendant's final claim of ineffective assistance charges incompetence in counsel's alleged failure to adequately argue in favor of a sentence less than death. However, we find no deficiency in defense counsel's closing argument. Therein, defense counsel alluded to the fact that defendant had instructed him *not* to argue against the imposition of the death penalty and counsel stated that he found it hard to argue against the death penalty "without [defendant's] acquiescence." However, defense counsel did argue a number of reasons why defendant should not be sentenced to death, including pointing to the mitigating evidence contained in the presentence report. Defense counsel concluded his argument by asking the court to carefully consider all the evidence and to arrive at a just verdict.

We find no incompetence evidenced by defense counsel's argument. Defense counsel highlighted what was apparently the only available mitigating evidence. Further, counsel argued against the death penalty to the extent he was able to, in light of defendant's apparent instructions *not* to argue against that sentence. Moreover, defense counsel made known to the court, through his closing argument, defendant's wish that his counsel not argue against a death sentence. This acknowledgement of the gravity of his conduct by defendant could certainly be seen as a mitigating circumstance. Thus, we find that defense counsel's closing argument was not unreasonable, particularly in light of the apparent constraints put upon counsel by defendant. See *Emerson*, 122 Ill. 2d at 439-40.

Accordingly, we find that none of the alleged errors pointed to by defendant, either separately or taken as a whole, establishes that defendant was denied the effec-

tive assistance of counsel as guaranteed by the sixth amendment. *People v. Hattery* (1985), 109 Ill. 2d 449, relied upon by defendant, is inapposite. Defense counsel in *Hattery* had, during the guilt phase of the defendant's capital murder trial, repeatedly and unequivocally conceded the defendant's guilt, presented no evidence on the defendant's behalf, made no closing argument, and advanced no theory of a defense to the murder charges. This court held that defense counsel's conduct denied defendant his sixth amendment right to the effective assistance of counsel because the prosecution's case was not subjected to "meaningful adversarial testing." In so holding, this court determined that counsel's actions deprived the defendant of the right to have the issue of his guilt presented to the jury as an adversarial issue. (*Hattery*, 109 Ill. 2d at 464.) The allegations of incompetence in the instant case do not even approach those found to warrant reversal in *Hattery*. There is no indication in this case that defense counsel in any way conceded that the death penalty was the appropriate sentence for defendant or that counsel's conduct otherwise resulted in a breakdown of the adversarial process. *Hattery* thus provides no support for defendant's argument.

## IV

As his final argument for vacating his death sentence, defendant challenges the constitutionality of the Illinois death penalty statute (Ill. Rev. Stat. 1989, ch. 38, par. 9—1). Defendant proffers two grounds for invalidating the statute: (1) that the statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences, and (2) that the statute violates the eighth and fourteenth amendments because it places a burden on the defendant which precludes meaningful consideration of mitigation.

As to the first of these challenges, this argument has been repeatedly considered and rejected by this court and we decline to reconsider this court's previous holdings. (See *People v. Johnson* (1991), 146 Ill. 2d 109, 154; *People v. Whitehead* (1987), 116 Ill. 2d 425, 465.) As to the second of these challenges, a brief discussion is warranted.

Defendant's argument in this regard focuses on the requirement in the death penalty statute that, if the sentencer finds no mitigating factors "sufficient to preclude" a sentence of death, the death penalty must be imposed. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(h).) Citing a dictionary definition of "preclude," defendant argues that this language places a burden on the defendant to provide mitigating evidence which makes imposition of the death penalty "impossible." Defendant contends that, once a defendant has been found eligible for death, a determination has been made that death is a *possible* sentence. Therefore, because a thing cannot be simultaneously possible and impossible, defendant asserts that only a sentencer who refuses to follow the law will fail to sentence an eligible defendant to death. We disagree with this interpretation.

This court has repeatedly held that the Illinois death penalty statute does not impose a constitutionally impermissible burden upon a defendant. (See *People v. Thomas* (1990), 137 Ill. 2d 500, 541-42; *People v. Bean* (1990), 137 Ill. 2d 65, 138-40; *People v. Fields* (1990), 135 Ill. 2d 18, 76; *People v. Jones* (1982), 94 Ill. 2d 275, 283.) This court has rejected the contention that the use of the term "preclude" requires the sentencer to impose death unless the defendant presents a complete defense to the aggravating factors which made him eligible for death. (*Jones*, 94 Ill. 2d at 283 (citing dictionary definitions of "preclude").) This court has also rejected the argument that the "sufficient to preclude" language cre-

ates a presumption that a defendant, once found eligible for death, should receive that sentence, which presumption the defendant must then overcome. (*Thomas*, 137 Ill. 2d at 541-42; *Bean*, 137 Ill. 2d at 138-40; *Fields*, 135 Ill. 2d at 75-76.) In rejecting these interpretations, this court has determined that the death penalty statute requires the sentencer to *balance* all the aggravating and mitigating evidence and to thereby determine whether death is the appropriate sentence. (See *Thomas*, 137 Ill. 2d at 538; *Bean*, 137 Ill. 2d at 140; *Fields*, 135 Ill. 2d at 76.) Thus, in accord with this court's past reasoning, we reject defendant's contention that the statute places a burden on the defendant to provide mitigating evidence which renders a death sentence "impossible."

We note that the United States Supreme Court, in *Walton v. Arizona* (1990), 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047, upheld the constitutionality of a death penalty statute which provided that death shall be imposed if the court finds one or more of the enumerated aggravating factors and finds that there are no mitigating circumstances "sufficiently substantial to call for leniency." The *Walton* Court specifically found no constitutional violation in the statute's requirement that the *defendant* establish the existence of "sufficiently substantial" mitigating circumstances. (*Walton*, 497 U.S. at 649, 111 L. Ed. 2d at 525, 110 S. Ct. at 3055.) We likewise find no constitutional infirmity in our death penalty statute's mandate that death be imposed if the sentencer determines that there are no mitigating factors "sufficient to preclude" that sentence. Defendant's challenges to the constitutionality of the Illinois death penalty statute are thus rejected.

## CONCLUSION

For the reasons set forth above, we affirm defendant's convictions and death sentence. We direct the clerk

of this court to enter an order setting Wednesday, November 11, 1992, as the date on which the sentence of death entered by the circuit court of Madison County shall be carried out in the manner provided by law. (Ill. Rev. Stat. 1989, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of this mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is confined.

*Judgment affirmed.*