# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People v. Hunt*, 2012 IL 111089

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. TAVARES HUNT, Appellee. |
| Docket No. | 111089 |
| Filed | April 19, 2012 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | "Custodial interrogation" was not taking place at a police station, and the appellate court erred in affirming a suppression under *McCauley*, where a suspect made statements while alone with an informer who was an inmate, even though the suspect's counsel on a different matter was unsuccessfully seeking access to him—*McCauley* and *Miranda* not applicable. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Fred G. Suria, Jr., Judge, presiding. |
| Judgment | Appellate court judgment reversed.<br>Circuit court judgment reversed.<br>Cause remanded. |

Counsel on
Appeal

Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Annette N. Collins and Susan R. Schierl Sullivan, Assistant State's Attorneys, of counsel), for the People.

Jack Rimland and Joshua B. Kutnick, of Chicago, for appellee.

Justices

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Thomas, Garman, Burke, and Theis concurred in the judgment and opinion.

Justice Freeman specially concurred, with opinion.

## OPINION

¶ 1    On April 14, 2003, defendant, Tavares Hunt, was arrested and charged with murder in the shooting death of Shakir Beckley. A Cook County grand jury indicted defendant and charged him with 33 counts of murder (720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2002)), 6 counts of attempted murder (720 ILCS 5/8-4, 9-1(a)(1) (West 2002)), 2 counts of armed robbery with a firearm (720 ILCS 5/18-2(a)(2) (West 2002)), 1 count of aggravated battery with a firearm (720 ILCS 5/12-4.2 (West 2002)), 7 counts of attempted armed robbery (720 ILCS 5/8-4, 18-2 (West 2002)), 1 count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2002)), and 1 count of aggravated battery with a deadly weapon (720 ILCS 5/12-4(b)(1) (West 2002)).

¶ 2    Defendant filed a motion to suppress tape recordings, statements, and conversations with an informant during court-ordered consensual overhears, arguing that they were obtained in violation of his fifth amendment right to counsel (U.S. Const., amend. V) and his rights to counsel and due process under the Illinois Constitution (Ill. Const. 1970, art. I, §§ 2, 10), as articulated by this court in *People v. McCauley*, 163 Ill. 2d 414 (1994). He also filed a motion to exclude tape recordings of those conversations, arguing that the recordings were substantially inaudible. The trial court granted both motions, suppressing defendant's statements and the recordings.

¶ 3    On interlocutory appeal, the appellate court affirmed the suppression order. *People v. Hunt*, 381 Ill. App. 3d 790, 809 (2008). This court affirmed in part, reversed in part, and remanded to the appellate court for its consideration of the suppression of the statements on fifth amendment and *McCauley* grounds. *People v. Hunt*, 234 Ill. 2d 49, 65-67 (2009). On remand, the appellate court affirmed the suppression of the statements on *McCauley* grounds. 403 Ill. App. 3d 802, 830.

¶ 4    We allowed the State's petition for leave to appeal. The sole issue on appeal is whether the statements were properly suppressed on *McCauley* grounds. For the following reasons,

we conclude that they were not. Accordingly, we reverse and remand to the trial court for further proceedings.

¶ 5                                     I. BACKGROUND

¶ 6        While defendant was being held in the Cook County jail on an unrelated charge, he became a suspect in Shakir Beckley's murder. In May 2002, Chicago police detectives took him from the county jail to a Chicago police station and questioned him about the murder. He denied any involvement in, or knowledge of, the murder. The detectives testified that they read him his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and he waived those rights before he was questioned. Defendant testified, however, that he told the detectives he was not speaking to them unless an attorney was present, but they continued to question him. The detectives denied that he said he did not want to talk to them or that he requested an attorney. In fact, they testified that he consented to, and took, a polygraph test, for which he signed a written waiver. After the polygraph test, the detectives questioned him again, and he continued to deny any involvement in the murder. Because the questioning finished late and they wanted to question him further, they kept him at the police station overnight. The next day, they questioned him again, and he continued to deny any involvement in the murder. The detectives fingerprinted him before returning him to the county jail later that day.

¶ 7        On June 28, 2002, an assistant public defender was assigned to represent defendant in the unrelated case. Defendant testified that he told counsel that day and on July 12, 2002, that Chicago police detectives were questioning him about an unrelated, uncharged matter and, on both days, counsel told him not to talk to the police.

¶ 8        On July 16 or 17, 2002, the detectives took defendant from the county jail to the police station so Mycal Davis, who was also in the jail on an unrelated charge, could view him in a lineup. The lineup had to be rescheduled because defendant and Davis were put in the bullpen together even though they were supposed to be brought out at different times so they would not see each other.

¶ 9        After Davis had been in the bullpen with defendant, he told the detectives that he knew defendant; that defendant was involved in Beckley's murder; that he and defendant had a conversation about Beckley's murder, in which defendant made incriminating statements; and that he thought he could get defendant to repeat the statements. The detectives then decided to set up a judicially authorized overhear, using Davis as the consenting party.

¶ 10       Defendant testified that on July 18, 2002, the detectives took him from the county jail to the police station and questioned him about Beckley's murder. Defendant testified that he told them he did not want to talk to them and that he wanted to talk to a lawyer.

¶ 11       On July 31, 2002, guards told defendant that the detectives were coming to put him in a lineup. He called counsel and left a message, asking counsel to go to the police station for the lineup.

¶ 12       The detectives then took defendant from the county jail to the police station, put him in an interview room, and left him alone for about three hours. During that time, he was not handcuffed and was given food and water. He was not questioned by any police officer that

day. At about 3 p.m., Davis, who was wearing a concealed wire pursuant to a court order, was put in the interview room with him. The detectives recorded the conversation between defendant and Davis and monitored the conversation from another room. Defendant allegedly implicated himself in Beckley's murder.

¶ 13    The lieutenant in charge of the Beckley investigation testified that, at some point during the overhear, when he took a break from monitoring the conversation, he was told that an attorney was there, asking to speak with defendant. He testified that he met with the attorney at about 4:02 p.m. The attorney said he represented defendant on an unrelated charge and asked why defendant was at the police station. The lieutenant responded that defendant was there for a lineup in a case under investigation, which was unrelated to the one for which he was in jail. Counsel asked to meet with defendant and to be present during the lineups. The lieutenant asked counsel to give him "about five minutes." According to the lieutenant, the overhear ended shortly after 4 p.m., and counsel was then allowed to speak with defendant.

¶ 14    Counsel testified, from his contemporaneous notes, that, after he got defendant's message on July 31, he called the police station and confirmed that defendant was there. He asked to speak with the detectives and was told they were "out in the field." He said he was coming down to the police station. He arrived at 3:14 p.m., and the detectives were paged at 3:19 p.m. Counsel testified that he repeatedly asked to speak with defendant but was not allowed to do so until sometime between 4:02 and 4:12 p.m. At 4:12 p.m., after meeting with counsel, defendant invoked his rights to remain silent and to have counsel present during questioning. According to the detectives, this was the first time defendant had invoked his rights.

¶ 15    On August 6, 2002, the detectives again took defendant from the county jail to the police station; put him in an interview room with Davis, who was wearing a concealed wire; and monitored and recorded the conversation, during which defendant again allegedly implicated himself in Beckley's murder. He was not questioned by the police that day. The public defender's office had withdrawn its representation of defendant in the unrelated case a few days earlier, and no counsel was present during the overhear that day.

¶ 16    Relying on *McCauley*, the trial court suppressed those parts of defendant's statements and recordings made after counsel arrived at the police station on July 31, holding that defendant had a right to speak with counsel within a reasonable time after counsel arrived. The court denied defendant's motion to suppress the August 6 statements and recordings because counsel was not present that day. The court later vacated its suppression order *sua sponte* and allowed the parties to provide additional arguments about the impact of counsel's arrival on July 31.

¶ 17    Defendant subsequently filed his motion to exclude the recordings, arguing that they were substantially inaudible. After listening to the recordings and hearing further arguments of counsel, the trial court suppressed all of defendant's statements and all of the recordings. In doing so, the court relied on *McCauley* and found that defendant had a right to speak with counsel within a reasonable time after counsel's arrival at the police station at 3:14 p.m. on July 31 but was not allowed to do so until 4:02 p.m., after the overhear ended. The court also suppressed the recordings on the alternative ground that they were substantially inaudible.

¶ 18    On interlocutory appeal, the appellate court affirmed the suppression order but on grounds not argued by the parties. *Hunt*, 381 Ill. App. 3d at 809. The court also affirmed the suppression of the recordings on the alternative ground that they were substantially inaudible. *Id.* at 808. This court reversed that part of the appellate court's judgment affirming the suppression order on grounds not raised by the parties, affirmed that part of its judgment affirming the suppression of the recordings on the alternative ground that they were substantially inaudible, and remanded the cause to the appellate court for its consideration of the suppression of the statements on fifth amendment and *McCauley* grounds. *Hunt*, 234 Ill. 2d at 67. On remand, the appellate court affirmed the suppression of the statements on *McCauley* grounds. 403 Ill. App. 3d at 830.

¶ 19    We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

¶ 20                              II. ANALYSIS

¶ 21    On appeal, the State no longer argues that the recordings should not have been suppressed as substantially inaudible; nor does defendant argue that the statements should have been suppressed under the fifth amendment. Thus, the sole issue on appeal is whether the statements were properly suppressed on *McCauley* grounds.

¶ 22    A trial court's ruling on a motion to suppress evidence is reviewed under the two-part test adopted by the United States Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996). *People v. Absher*, 242 Ill. 2d 77, 82 (2011). The court's factual findings are upheld unless they are against the manifest weight of the evidence. The reviewing court then assesses the established facts in relation to the issues presented and may reach its own conclusions as to what relief, if any, should be allowed. Accordingly, the ultimate legal question of whether suppression is warranted is reviewed *de novo*.

¶ 23    The fifth amendment to the United States Constitution, which applies to the states by virtue of the fourteenth amendment (*Malloy v. Hogan*, 378 U.S. 1, 6 (1964)), provides, in pertinent part, that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. In *Miranda*, the United States Supreme Court adopted prophylactic measures to protect a suspect's fifth amendment privilege against compelled self-incrimination from the "inherently compelling pressures" of custodial interrogation. *Miranda*, 384 U.S. at 467. The Court noted that "incommunicado" interrogation in a "police-dominated atmosphere" (*id.* at 456-57) involves psychological pressures that "work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely" (*id.* at 467). Thus, the Court reasoned, "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *Id.* at 458.

¶ 24    To combat this inherent compulsion, and thereby protect the privilege against compelled self-incrimination, the Court held that a prosecutor may not use statements arising from a custodial interrogation of a defendant unless he can show the use of procedural safeguards effective to secure the defendant's privilege against compelled self-incrimination. *Id.* at 444.

¶ 25    *Miranda* requires law enforcement officers to warn a suspect before a custodial

interrogation that: he has the right to remain silent; anything he says can be used against him in a court of law; he has the right to have an attorney present; and if he cannot afford an attorney, one will be appointed for him before questioning if he so desires. *Id.* at 479. The *Miranda* Court defined "custodial interrogation" as "questioning initiated *by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (Emphasis added.) *Id.* at 444.

¶ 26     On remand in the present case, as both the State and defendant acknowledge, the appellate court properly concluded that "if we followed United States Supreme Court case law interpreting the fifth amendment, no *Miranda* warnings are required when a defendant is talking to an undercover agent or an informant; therefore, [defendant] would not have to be informed about his counsel being present at the police station." 403 Ill. App. 3d at 821. It reached this conclusion by analyzing the foundational doctrines within the prophylactic *Miranda* regime, which demonstrate that defendant's conversation with Davis, an undercover informant and fellow inmate, was not a "custodial interrogation." *Id.* at 815-19; see *Illinois v. Perkins*, 496 U.S. 292, 296-97 (1990) (*Perkins I*).

¶ 27     The appellate court found, however, that, under Illinois's constitution and statutes, as interpreted by the courts in *McCauley* and *People v. Perkins*, 248 Ill. App. 3d 762 (1993) (*Perkins II*), defendant's conversation with Davis, an undercover informant and fellow inmate, was a "custodial interrogation." 403 Ill. App. 3d at 823-24. As we will explain below, that finding is erroneous.

¶ 28     In *Perkins*, the defendant was arrested on a Saturday for aggravated battery. *Perkins II*, 248 Ill. App. 3d at 763. While he was in jail over the weekend, an undercover officer and an undercover informant were placed in his cellblock and elicited incriminating statements from him about an unrelated, uncharged murder. His statements were suppressed, and the appellate court affirmed. *People v. Perkins*, 176 Ill. App. 3d 443, 450 (1988) (*Perkins I*). The United States Supreme Court reversed, holding that "an undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response." *Perkins I*, 496 U.S. at 300. In *Perkins I*, the Court held that the statements at issue were voluntary and that there was no federal obstacle to their admissibility at trial. The Court explained as follows:

> "Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect. [Citations.] When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking. [Citations.] ***

> It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation. ***

> *Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner. As we recognized in *Miranda*: 'Confessions remain a proper element in law enforcement.

-6-

Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.' [Citation.] Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns. [Citations.]

*Miranda* was not meant to protect suspects from boasting about their criminal activities in front of persons whom they believe to be their cellmates." *Id.* at 296-98.

¶ 29 On remand to the trial court, the defendant filed a second motion to suppress, alleging, for the first time, that he had asserted his right to counsel after his arrest for aggravated battery. *Perkins II*, 248 Ill. App. 3d at 764. His statements were again suppressed. The appellate court stated that the crux of the case was: "Where a suspect has asserted his fifth amendment right to counsel, can he be questioned by undercover agents on a separate, unrelated, and uncharged offense while in jail, without the presence of an attorney, and without an opportunity to waive his right to counsel?" *Id.* at 767-68. The appellate court affirmed the suppression of the defendant's statements, holding that the undercover agents' actions violated his "fifth amendment right to counsel." *Id.* at 768.

¶ 30 In reaching this conclusion, the appellate court in *Perkins II* relied on *Rhode Island v. Innis*, 446 U.S. 291 (1980). In *Innis*, the defendant was arrested for murder. *Id.* at 293-94. After he was advised of his *Miranda* rights, he requested an attorney. *Id.* at 294. On the way to the police station, the two transporting officers engaged in a conversation with each other about a gun missing from the murder scene and how terrible it would be if one of the children from the nearby school for handicapped children found the gun and was hurt. *Id.* at 294-95. The defendant immediately told the officers to turn the car around so that he could show them where the gun was located. *Id.* at 295. He then led them to the spot where the gun was hidden. When the defendant made the incriminating statements, he was in custody and had invoked his right to counsel. *Id.* at 298. The issue in *Innis* was whether the defendant was "interrogated" by the officers in violation of his fifth amendment right to remain silent until he had consulted with a lawyer. The *Innis* Court explained as follows:

"It is clear *** that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying

-7-

intent of the police." *Id.* at 300-01.

¶ 31    The *Innis* Court concluded that the defendant was not "interrogated" within the meaning of *Miranda*. *Id.* at 302. The Court noted that the first prong of the definition of "interrogation" was not satisfied because the conversation between the officers included no express questioning of the defendant. Moreover, the Court concluded that the defendant was not subjected to the "functional equivalent" of questioning because it could not be said that the officers should have known that their conversation was reasonably likely to elicit an incriminating response from the defendant.

¶ 32    Relying on *Innis*, the appellate court in *Perkins II* held that the police knew or should have known that their actions in using an undercover law enforcement officer posing as a fellow inmate were reasonably likely to elicit an incriminating response and that, because the defendant had invoked his right to counsel, their actions amounted to the functional equivalent of direct questioning and violated the Court's rulings construing the fifth amendment privilege against compelled self-incrimination. *Perkins II*, 248 Ill. App. 3d at 771.

¶ 33    In so concluding, the appellate court in *Perkins II* totally disregarded the fact that, in *Perkins I*, the United States Supreme Court had already determined that "an undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response." *Perkins I*, 496 U.S. at 300. Implicit in this holding is that questioning by an undercover law enforcement officer posing as a fellow inmate is not an "interrogation" under *Miranda*.

¶ 34    The fact that the defendant in *Perkins II* requested counsel when he was arrested for aggravated battery did not change the fact that *Miranda* warnings were not required before he spoke to an undercover law enforcement officer posing as a fellow inmate about an unrelated, uncharged murder. Because, as the United States Supreme Court decided in *Perkins I*, *Miranda* warnings were not required before the defendant was questioned, it follows that he had no fifth amendment right to counsel, and it was irrelevant that he had requested counsel when he was arrested for the unrelated aggravated battery. Accordingly, the appellate court's decision to the contrary in *Perkins II*, 248 Ill. App. 3d at 769, is hereby expressly overruled.

¶ 35    It is also interesting to note that the appellate court's decision in *Perkins II* was based on federal, not Illinois, constitutional law. See also *People v. Manning*, 182 Ill. 2d 193, 206 (1998) ("*Miranda* is not implicated in conversations between suspects and undercover agents. The essential ingredients of a police-dominated atmosphere and compulsion are not present when a prisoner speaks freely to an undercover agent.").

¶ 36    We turn now to *McCauley*, 163 Ill. 2d 414. In *McCauley*, the defendant was brought to the police station for questioning about a murder, was advised of his *Miranda* rights, and did not request an attorney. *Id.* at 417-18. However, unbeknownst to the defendant, his family had retained an attorney for him, and the attorney had gone to the police station and asked to speak with him. *Id.* at 418-19. The police refused to allow the attorney access to the defendant and failed to inform the defendant that his attorney was present at the police station asking to speak with him. *Id.* at 419. The defendant subsequently gave a statement

to the police in response to their questioning. *Id.* at 420. The trial court suppressed the statement, and this court affirmed.

¶ 37    The *McCauley* court noted that, in *Moran v. Burbine*, 475 U.S. 412 (1986), the United States Supreme Court had rejected the argument that similar police conduct violated a defendant's right to counsel under the fifth amendment to the United States Constitution. *McCauley*, 163 Ill. 2d at 422-23. The *McCauley* court then considered whether such conduct violated the defendant's right to counsel under article I, section 10, of the Illinois Constitution of 1970, which provides, in pertinent part, that "[n]o person shall be compelled in a criminal case to give evidence against himself" (Ill. Const. 1970, art. I, § 10). *McCauley*, 163 Ill. 2d at 423.

¶ 38    In holding that the police conduct in *McCauley* violated the defendant's rights under the Illinois Constitution, the court explained:

> "The day is long past in Illinois *** where attorneys must shout legal advice to their clients, held in custody, through the jailhouse door. In this case, we determine that our State constitutional guarantees afforded defendant a greater degree of protection [than their federal counterparts]. Our State constitutional guarantees simply do not permit police to delude custodial suspects, exposed to interrogation, into falsely believing they are without immediately available legal counsel and to also prevent that counsel from accessing and assisting their clients during the interrogation." *McCauley*, 163 Ill. 2d at 423-24.

¶ 39    The *McCauley* court held that, under Illinois law, " 'when police, prior to or during custodial interrogation, refuse an attorney appointed or retained to assist a suspect access to the suspect, there can be no knowing waiver of the right to counsel if the suspect has not been informed that the attorney was present and seeking to consult with him.' " *Id.* at 424-25 (quoting *People v. Smith*, 93 Ill. 2d 179, 189 (1982)). The *McCauley* court also held that "due process is violated when police interfere with a suspect's right to his attorney's assistance and presence by affirmatively preventing the suspect, exposed to interrogation, from receiving the immediately available assistance of an attorney hired or appointed to represent him." *McCauley*, 163 Ill. 2d at 444. See Ill. Const. 1970, art. I, § 2 ("[n]o person shall be deprived of life, liberty or property without due process of law"). Thus, the court concluded that the police conduct violated the defendant's privilege against compelled self-incrimination and his right to due process. *McCauley*, 163 Ill. 2d at 446.

¶ 40    However, the *McCauley* court did not eschew the *Miranda* regime itself; instead, it superimposed a state-specific right onto the existing *Miranda* framework. The constitutional justification for the *Miranda* regime is police custodial interrogation. Contrary to the appellate court's conclusion, *McCauley* did not reject this foundation by taking the police out of the equation. Accordingly, we hold that, like a suspect's *Miranda* rights, his *McCauley* right to an immediately available attorney arises only during police custodial interrogation.

¶ 41    In the present case, because defendant was not subjected to police custodial interrogation when he had a conversation with Davis, an undercover informant and fellow inmate, during the overhears, *Miranda* and *McCauley* are inapplicable. See *Perkins I*, 496 U.S. at 300; *Miranda*, 384 U.S. at 444, 467; *McCauley*, 163 Ill. 2d at 424-25, 444. Accordingly, the

detectives were not required to give defendant *Miranda* warnings before the overhears; defendant had no constitutional right to counsel during the overhears; the detectives were not required to inform defendant that his counsel in an unrelated case was at the police station, asking to speak with him during the first overhear; and the appellate court erred in upholding the suppression of the statements on *McCauley* grounds. We also decline to extend the *McCauley* right to protect the attorney-client relationship outside the context of police custodial interrogation.

¶ 42     Because our resolution of this issue is dispositive on appeal, we need not address the State's other arguments—that the appellate court erred in finding that (1) defendant had invoked his right to counsel on July 18; and (2) he was in "*Miranda* custody" during the overhears.[1]

¶ 43                                                        CONCLUSION

¶ 44     For the foregoing reasons, we reverse the judgments of the appellate court and the trial court and remand to the circuit court of Cook County for further proceedings consistent with this opinion.

¶ 45     Appellate court judgment reversed.

¶ 46     Circuit court judgment reversed.

¶ 47     Cause remanded.

¶ 48     JUSTICE FREEMAN, specially concurring:

¶ 49     I agree with the majority's holding that statements made by defendant to an informant during a court-ordered overhear were not obtained in violation of his rights to counsel and to due process under the Illinois Constitution (Ill. Const. 1970, art. I, §§ 2, 10), as set forth by this court in *People v. McCauley*, 163 Ill. 2d 414 (1994). I therefore concur in its judgment. I write separately, however, to emphasize that our decision today should not be construed as a departure from *McCauley*.

¶ 50     As noted by the majority, the trial court, relying upon *McCauley*, suppressed statements made by defendant to police informant Mycal Davis during judicially authorized overhears.

---

[1]The United States Supreme Court's recent decision in *Howes v. Fields*, ___ U.S. ___, 132 S. Ct. 1181 (2012), addressing the issue of the appropriate standard for determining whether a prisoner was in *Miranda* custody during police questioning, is consistent with our interpretation of "custodial interrogation." As the Court explained: "As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Id.* at ___, 132 S. Ct. at 1189. The Court noted that "standard conditions of confinement and associated restrictions on freedom will not necessarily implicate the same interests that the Court sought to protect when it afforded special safeguards to persons subjected to custodial interrogation. Thus, service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody." *Id.* at ___, 132 S. Ct. at 1191.

The majority correctly points out that "the sole issue on appeal is whether the [defendant's] statements were properly suppressed on *McCauley* grounds." *Supra* ¶ 21. On that point, the majority notes:

> "[T]he *McCauley* court did not eschew the *Miranda* regime itself; instead, it superimposed a state-specific right onto the existing *Miranda* framework. The constitutional justification for the *Miranda* regime is police custodial interrogation. Contrary to the appellate court's conclusion, *McCauley* did not reject this foundation by taking the police out of the equation. Accordingly, we hold that, like a suspect's *Miranda* rights, his *McCauley* right to an immediately available attorney arises only during police custodial interrogation." *Supra* ¶ 40.

¶ 51    I believe that the better approach to resolving this case is to point out that *McCauley* and this case are not close factually.

¶ 52    *McCauley* involved a situation where a defendant, though Mirandized, was interrogated by police without having been told that his lawyer had arrived at the station and was prevented from seeing him.

¶ 53    In affirming suppression of the defendant's statements, this court rejected the argument that the interpretation of a defendant's right to counsel under the Illinois Constitution must be in complete lockstep with the Supreme Court's decision in *Moran v. Burbine*, 475 U.S. 412 (1986). Instead, we agreed with the defendant that *Burbine* "represent[ed] a regressive interpretation of fifth amendment protections" (*McCauley*, 163 Ill. 2d at 421), and refused to apply the federal constitutional analysis developed in that case.

¶ 54    Rather, we looked to the safeguards provided to the defendant under our state constitution, and held that they "afforded defendant a greater degree of protection" than did federal law. *Id.* at 423. In holding that the conduct of the police violated the defendant's state rights against self-incrimination and to due process (Ill. Const. 1970, art. I, §§ 2, 10), we underscored that "[o]ur State constitutional guarantees simply do not permit police to delude custodial suspects, exposed to interrogation, into falsely believing they are without immediately available legal counsel and to also prevent that counsel from accessing and assisting their clients during the interrogation." *McCauley*, 163 Ill. 2d at 423-24 (citing Ill. Const. 1970, art. I, §§ 2, 10).

¶ 55    It is my position that the fundamental, factual differences between these two cases renders *McCauley* inapplicable here. Unlike in *McCauley*, where counsel arrived at the station while the defendant was being interrogated by two *police officers* and the police prevented the attorney from consulting with his client, in this case, when counsel arrived defendant was engaged in a judicially sanctioned, overheard conversation with a *fellow inmate* who was operating as an informant. *Id.*

¶ 56    That being said, I wish to underscore that today's decision in no way erodes *McCauley*'s holding that the police conduct which occurred there remains a clear violation of a defendant's rights under our state constitution. Indeed, this court has unanimously held that "the *McCauley* decision represents this court's refusal to allow this state's counterpart to the fifth amendment right to counsel to diminish the way the federal right had in *Burbine*" (*Relsolelo v. Fisk*, 198 Ill. 2d 142, 152 (2001)), and has observed that "the police conduct at

issue [in *McCauley*] implicated state due process concerns" (*People v. Caballes*, 221 Ill. 2d 282, 301 (2006)). Accordingly, the force and effect of *McCauley* remains unchanged.