2018 IL App (1st) 153323

FIRST DISTRICT
FIRST DIVISION
December 24, 2018

No. 1-15-3323

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 18777 |
| | ) | |
| COURTNEY WOODS, | ) | Honorable |
| | ) | Catherine Marie Haberkorn, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justice Walker concurred in the judgment and opinion.
Justice Pierce specially concurred, with opinion.

**OPINION**

¶ 1    Courtney Woods was found guilty after a bench trial of two counts of armed robbery (720 ILCS 5/18-2(a)(2), (3) (West 2012)) and sentenced to concurrent terms of 34 years' imprisonment. On appeal, he argues his fifth amendment right against self-incrimination was violated at sentencing, when the trial court ordered him to participate in a presentence investigation (PSI) by speaking with the investigator, and information that he told the investigator was then used against him to increase his sentence. He also argues that one conviction must be vacated in light of the one-act, one-crime doctrine and that some of his fines and fees should be vacated. We vacate Mr. Woods's sentence and remand for resentencing, with directions.

¶ 2                                    I. BACKGROUND

¶ 3    Mr. Woods was charged in a 20-count information with attempted first degree murder, armed robbery, armed habitual criminal, aggravated discharge of a firearm, vehicular invasion, aggravated unlawful use of a weapon (AUUW), unlawful use of a weapon by a felon, aggravated battery, and aggravated unlawful restraint.

¶ 4    The testimony at trial was that, on September 15, 2012, Tiffany House and her husband Anton Brown drove to a restaurant in Chicago and parked in the back area. Before Mr. Brown went inside to place an order, he gave Ms. House $1850 in cash, the money Ms. House had given him earlier that day when they were shopping for a car. Ms. House was in the car counting the money when Mr. Woods came out of the back of the restaurant carrying a white bag and walked past the car into an alley. Less than five minutes later, Mr. Woods returned and came up to the passenger side of the car with a revolver. Ms. House's window was down, and Mr. Woods put the gun to Ms. House's head and demanded the money.

¶ 5    Ms. House screamed for her husband and pushed the car door towards Mr. Woods. She threw the money and ran from the car towards the back door of the restaurant. Mr. Woods followed her and pushed her against the wall of the restaurant, but Ms. House was able to get past him and run inside. Mr. Brown came out and saw Mr. Woods picking up the money before running away and he chased after Mr. Woods into an alley. Mr. Woods fired his gun at Mr. Brown and missed, then continued running.

¶ 6    Either the same night or the following night, Ms. House began to investigate a website containing thousands of mugshots of people recently arrested in Cook County. Ms. House was able to find a photograph of the person that she thought had robbed her. She then spoke with a police detective and showed him the picture she printed from the website.

¶ 7   Mr. Woods was arrested one week later. On September 26, 2012, both Ms. House and Mr. Brown viewed a physical lineup at the police station and both separately identified Mr. Woods as the person who robbed Ms. House and shot at Mr. Brown.

¶ 8   The trial court found Mr. Woods guilty of all charges. In response to Mr. Woods's motion for a new trial, the trial court reconsidered its ruling and found Mr. Woods not guilty of the three counts of attempted murder. Mr. Woods was sentenced on two counts of armed robbery, one premised on Mr. Woods's possession of a firearm and the other on his personal discharge of a firearm. The trial court then ordered a PSI report.

¶ 9   The initial PSI report contained no information beyond a recitation of Mr. Woods's criminal history and the official version of the offense. The "Summary" section stated that Mr. Woods "respectfully declined to answer any questions pertaining to his investigation." At a hearing after the return of the PSI report, the following exchange occurred:

"THE COURT: We received information that [Mr. Woods] did not talk to probation for the PSI; is that correct?

[DEFENSE ATTORNEY]: Yes, your Honor.

THE COURT: You need to speak with them. I've ordered you to speak with them. You need to speak with them. Understood?

[MR. WOODS]: (No verbal response.)

THE COURT: We need to continue to get the presentence investigative report."

¶ 10   Mr. Woods then completed an interview for a PSI, and a new PSI report was filed with the trial court. This revised PSI report included Mr. Woods's statements regarding his social and educational background. The investigator reported that Mr. Woods "admitted" he was a former member of the Mafia Insane Vice Lords street gang. Mr. Woods told the investigator he joined

the gang at age 13 but left at age 24 because he wanted to be a positive role model for his younger half-brothers. Mr. Woods told the investigator he had a good childhood and that his " 'whole world literally collapsed' " when his mother, who was his "best friend," died of breast cancer in 2006. Mr. Woods started " 'running the streets' " and getting into trouble after his mother died. Mr. Woods reported completing eighth grade but then dropping out because " 'his heart wasn't in it.' " In the section of the report titled "Defendant's Version of the Offense," the investigator noted that "[Mr. Woods] did not wish to comment on the facts of this case upon the advice of his attorney." The report set forth his criminal history, including that he received probation for a 2006 AUUW conviction, which was terminated unsatisfactorily, and consecutive three-year terms of imprisonment in 2007 for robbery and AUUW.

¶ 11     At Mr. Woods's sentencing hearing, the State emphasized his criminal background and his previous affiliation with the Mafia Insane Vice Lords gang. Based on Mr. Woods's prior gun and robbery convictions, and because Mr. Woods was now found guilty of armed robbery with personal discharge of a firearm, the State asked for a substantial amount of prison time.

¶ 12     In mitigation, defense counsel pointed to the facts in the PSI report that Mr. Woods was raised by his mother without his father's involvement and that his stepfather was killed during a robbery when Mr. Woods was 10 years old. The defense stressed that Mr. Woods's mother tried to keep Mr. Woods and his two younger brothers safe by frequently moving them around to different places and that, as a result, Mr. Woods did not progress in school and never completed high school. Counsel informed the trial court that Mr. Woods first entered the Illinois Department of Corrections in 2006, which was the same year his mother died from breast cancer. Counsel concluded by pointing out to the trial court that, despite his problems, Mr. Woods made sure his younger half-brothers finished high school, obtained good jobs, and had good lives.

¶ 13    The trial court considered the aggravating and mitigating factors, noting the seriousness of the offense, which created a terrifying situation for the victim when Mr. Woods fired his weapon. The trial court also lamented the "sad state of affairs" in the city where people had to worry about their own lives when they go out to eat in the neighborhood. The court recounted Mr. Woods's prior criminal history where Mr. Woods was given opportunities with supervision and probation but noted "weapons do keep tending to reappear in [Mr. Woods's] life."

¶ 14    The trial court stated that "[t]here's only so much the court system can do if you're not willing to accept the help and to try to change your ways." It noted that Mr. Woods had a great mother and there was no evidence of any abuse or neglect in Mr. Woods's childhood, but he still "continued to be involved in gangs and guns." With respect to school, the trial court noted:

> "You said your heart wasn't into it. What does that mean? You're supposed to go to school. You need the school to be a better person, to get a job, to be able to support yourself and your family, instead of going to the games [*sic*] and sticking up people and taking their money and taking what they've worked hard for."

¶ 15    The trial court went on to note, from the PSI report, that Mr. Woods had "more than other students do, and you just drop[ped] out," that he "could have had the, you know, help of the \*\*\* teammates and the basketball team and your coach, \*\*\* but instead, you go to the streets and hang out with the gang members." It reiterated that "gangs and guns" was his repeated choice.

¶ 16    The trial court then made a finding that there had been no great bodily harm to either of the victims, which made Mr. Woods eligible for day for day good time. The court sentenced Mr. Woods to 34 years' imprisonment "on the armed robbery with a gun" and stated "[t]he other counts will merge." This sentence was eight years more than the minimum sentence of 26 years. Armed robbery was a Class X felony with a sentencing range of 6 to 30 years and there was a

mandatory 20-year sentencing enhancement based on the finding that Mr. Woods discharged a firearm. 720 ILCS 5/18-2(b) (West 2012).

¶ 17    In addition to the prison sentence, Mr. Woods was also assessed fines and fees in the amount of $924. The mittimus reflects convictions under count IV, armed robbery with a firearm, and count V, armed robbery with personal discharge of a firearm, with concurrent sentences of 34 years' imprisonment for each. Mr. Woods filed a motion to reconsider sentence, which the trial court denied.

¶ 18                                    II. JURISDICTION

¶ 19    Mr. Woods was sentenced on September 18, 2015, and timely filed his notice of appeal that same day. This court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 and 606, governing appeals from final judgments of conviction in criminal cases (Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013)).

¶ 20                                    III. ANALYSIS

¶ 21                                    A. Fifth Amendment

¶ 22    Mr. Woods argues his fifth amendment right against self-incrimination was violated when the trial court ordered him to participate in a PSI and then used the information that he provided about his prior gang affiliation and educational background against him in aggravation at sentencing.

¶ 23    The fifth amendment commands that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. The fifth amendment applies to the states by virtue of the fourteenth amendment (*People v. Hunt*, 2012 IL 111089, ¶ 23; U.S. Const., amend. XIV), and its protection against self-incrimination applies to sentencing proceedings

(*Mitchell v. United States*, 526 U.S. 314, 328-29 (1999); *People v. Maggio*, 2017 IL App (4th) 150287, ¶ 48).

¶ 24    To preserve a sentencing issue for appeal, a defendant must generally raise the issue in the trial court, including through a written motion to reconsider sentence. *People v. Sharp*, 2015 IL App (1st) 130438, ¶ 132. Here, Mr. Woods filed a motion to reconsider sentence but did not argue his fifth amendment rights were violated at sentencing. He argues however, that we may review the forfeited issue on any of the following bases: (1) the trial court's insistence that he supply information in the PSI investigation, along with its use of that information, was plain error, (2) application of the forfeiture rule should be less rigid where the basis of the objection is the trial court's own conduct, as our supreme court recognized in *People v. Sprinkle*, 27 Ill. 2d 398, 400-01 (1963), or (3) his trial counsel was ineffective for failing to preserve the issue.

¶ 25    Plain error analysis can be a proper basis to review unpreserved trial court errors in sentencing. See *People v. Nitz*, 219 Ill. 2d 400, 411 (2006). Under this rule, a defendant must show first that a clear or obvious error occurred (*People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)) and second that either the evidence at the sentencing hearing was closely balanced or the error was so egregious as to deprive the defendant of a fair sentencing hearing (*People v. Hall*, 195 Ill. 2d 1, 18 (2000)).

¶ 26    Not every error in sentencing affects a fundamental right to liberty (*People v. Rathbone*, 345 Ill. App. 3d 305, 312 (2003)), but where "the error was sufficiently grave" as to call into question the integrity of the sentencing hearing, we may review it under the second prong of plain error analysis (*id.* (citing *People v. Fuller*, 205 Ill. 2d 308 (2002))). Mr. Woods argues that compelling a criminal defendant to participate in a PSI and then using the information gathered in aggravation raises a grave question about the fairness and integrity of the sentencing hearing

and thus comes within second prong plain error. See *Fuller*, 205 Ill. 2d at 343-44 (finding the trial court's failure to give a correct jury instruction at the death-penalty eligibility phase of a capital sentencing proceeding was plain error).

¶ 27　The State makes no argument on the merits of Mr. Woods's claim of a fifth amendment violation but argues only that his failure to raise this issue with the trial court results in a forfeiture that precludes our review of his claim. The State relies on our supreme court's decisions in *People v. Hampton*, 149 Ill. 2d 71 (1992), and *People v. Hillier*, 237 Ill. 2d 539 (2010). In both *Hampton* and *Hillier*, the court held that a defendant forfeited claims that the trial court violated his fifth amendment right by relying on statements that the defendant made in a PSI interview and sex offender evaluation when it sentenced the defendant.

¶ 28　But in both *Hampton* and *Hillier* the defendant's primary argument was that he was entitled to *Miranda* warnings (*Miranda v. Arizona*, 384 U.S. 436 (1966)) prior to participating in a PSI. *Hampton*, 149 Ill. 2d at 96; *Hillier*, 237 Ill. 2d at 547. In neither of those cases was there a record of the defendant's refusal to participate or of the trial court's ordering the defendant to participate.

¶ 29　In *Hampton*, our supreme court ruled that it should not decide whether a defendant was entitled to *Miranda* warnings prior to talking to an investigator because there the defendant did not object to speaking to the investigator and did not move to suppress the statements that he made to the investigator. *Hampton*, 149 Ill. 2d at 99. As the court noted, it could not even tell on the record before it whether the defendant was actually given *Miranda* warnings. *Id.* at 99-100. In *Hampton*, the court specifically noted that "no contention is made by defendant that his statements were in any way compelled, coerced or otherwise rendered involuntary so as to have violated defendant's privilege under the fifth amendment against compelled self-incrimination."

*Id.* at 103.

¶ 30    The *Hillier* court followed *Hampton* because, again, there was no objection and no showing that the defendant did not actually receive *Miranda* warnings. *Hillier*, 237 Ill. 2d at 548-49. In addition, in *Hillier*, the defendant did not even argue for plain-error review. *Id.* at 549.

¶ 31    We acknowledge that in *Hampton*, our supreme court rejected second-prong plain error review on the basis that, even if there had been a failure to give *Miranda* warnings, this was not a fifth amendment violation. *Hampton*, 149 Ill. 2d at 103. The court also noted that it had declined to apply the plain error exception in cases with allegations that a defendant's constitutional rights were violated, including cases involving improper comments by a prosecutor on a defendant's post-arrest silence (*People v. Herrett*, 137 Ill. 2d 195, 215-16 (1990)), comments about a defendant's failure to testify (*People v. Whitehead*, 116 Ill. 2d 425, 448-49 (1987)), allegations that a defendant's confession was involuntary (*People v. Byrd*, 139 Ill. App. 3d 859, 864 (1986)), and claims that a confession was "not the product of a rational mind or a free will" (*People v. Gacy*, 103 Ill. 2d 1, 28 (1984)). *Hampton*, 149 Ill. 2d at 104.

¶ 32    However, in each of those cases, and in *Hampton* as well, the reviewing court conducted a fact-specific inquiry to determine if the error in question merely implicated a constitutional right but the prejudicial effect was minimized in the course of the proceedings, or whether the error was so serious that it rendered the trial unfair and made plain error review "necessary to preserve the integrity and reputation of the judicial process." (Internal quotation marks omitted.) *Id.* at 102-05; see, *e.g.*, *Whitehead*, 116 Ill. 2d at 448-49 (finding prosecutor's improper, isolated reference that the defendant was a " 'sex pervert' " was not " 'so seriously prejudicial' " that it affected the fairness of the trial where it "might have been a fair reflection of the evidence" and was a response to the defendant's claim that he had no motive to kidnap the victim).

¶ 33    The issue in *Hampton* and *Hillier* was whether the court should consider a claim that a defendant was not given *Miranda* warnings, where no objection had been made and the record was unclear as to whether the defendant had, in fact, been given *Miranda* warnings. As the court noted in *Hampton*, the United States Supreme Court has made it clear that "the *Miranda* holding sweeps more broadly than the fifth amendment, and that the prophylactic *Miranda* warnings *** are not themselves rights protected by the Constitution." (Internal quotation marks omitted.) 149 Ill. 2d at 103-04. In contrast to those cases, this case represents a direct assault on Mr. Woods's fifth amendment rights, rather than a possible failure to invoke a "prophylactic" warning.

¶ 34    The error here was made more difficult to correct because of the direct role played by the trial court. Mr. Woods correctly cites the holding of our supreme court in *Sprinkle*, 27 Ill. 2d at 401, that "a less rigid application of the rule [of forfeiture] *** should prevail where the basis for the objection is the conduct of the trial judge." Mr. Woods was specifically told by the judge that he had to talk to pretrial services and then the judge used that information to increase Mr. Woods's sentence. In our view, this error should be reviewed both because it is a direct infringement of a constitutional right, and because that infringement came from the court.

¶ 35    We are sympathetic to the trial court's premise that, generally speaking, it is helpful to a defendant, as well as to the court, to have some understanding of the defendant's background at the time of sentencing. This context can often help mitigate the trial court's view of the criminal conduct for which the defendant has been convicted. Unfortunately in this case, the trial court appears to have viewed as only negative, some of the information that could have been used as mitigation. For example, Mr. Woods reported that he was a *former* gang member who had quit because he "wanted to be a positive role model for his younger half-brothers." The trial court did not mention this, but instead referred repeatedly to his membership in "gangs."

¶ 36    The State does not dispute that Mr. Woods had a fifth amendment right not to be compelled to provide information that was used against him at sentencing. Nor does the State dispute that the information Mr. Woods provided was, in fact, used against him. Mr. Woods's first PSI report said nothing about gang involvement or when Mr. Woods stopped attending school. There was also no testimony at trial about the offense being gang-related. The PSI report that was provided to the trial court after Mr. Woods was required to participate reflects that Mr. Woods told the PSI investigator that he had been affiliated with the Mafia Insane Vice Lords and that he dropped out of school after the 10th grade. The State emphasized these facts and the trial court made multiple references to his gang involvement, concluding that Mr. Woods kept returning to "gangs and guns" throughout his life. The trial court also chastised Mr. Woods for dropping out of school. The sentence imposed was eight years longer than the lengthy minimum sentence that this conviction required.

¶ 37    We find that the trial court plainly erred by insisting that Mr. Woods cooperate with the PSI and then using this information against him as reflected in the repeated reference to Mr. Woods's past gang participation and educational history. This error deprived Mr. Woods of a fair sentencing hearing and therefore requires us to vacate Mr. Woods's sentence.

¶ 38    In a special concurrence, our colleague agrees that we must remand for resentencing, but only because the trial court relied on an aggravating factor that was not supported by the record, specifically gang membership, when Mr. Woods had quit the gang when he was 24. Our colleague concludes that the record "is patently insufficient to establish that defendant was compelled to provide information during the PSI in violation of his fifth amendment rights," arguing that a postconviction proceeding based on an affidavit articulating Mr. Woods's reasons for later participating in the PSI would fill this gap in the record. However, we fail to see how

such an affidavit or factfinding, addressing whether Mr. Woods participated strategically or compulsively, is necessary to our finding that Mr. Woods's right to remain silent was violated here. There is no dispute that the record shows that Mr. Woods initially refused to participate in the PSI, then was ordered to do so by the trial court, and then provided information that was used against him at sentencing. The fact that Mr. Woods may have been advised by counsel that he did not have to provide information about the specifics of the charged crime or that a probation officer may have "Mirandized" him, in no way diminishes the fact that Mr. Woods was ordered by the trial court to surrender his fifth amendment rights.

¶ 39    We agree with Mr. Woods that the remedy here is to remand for resentencing to the presiding judge of the criminal division so that Mr. Woods can be resentenced before a new judge with a new PSI. While, as noted above, we understand why the trial court acted as it did, as our supreme court has recognized, the best way to "remove any suggestion of unfairness" is to have the case assigned to a new judge on remand, where, as here, improper considerations have come into the sentencing process. *People v. Heider*, 231 Ill 2d 1, 25 (2008).

¶ 40                              B. One Act, One Crime

¶ 41    We will address Mr. Woods's argument that his conviction for armed robbery with possession of a firearm (count IV) must be vacated because it is predicated on the same physical act as his conviction for armed robbery with personal discharge of a firearm (count V), since this same situation will exist on remand. The State concedes that Count 4count IV should be vacated and we anticipate that the State will continue to make this concession to the trial court. Although Mr. Woods did not raise this claim in the trial court, "forfeited one-act, one-crime arguments are properly reviewed under the second prong of the plain-error rule because they implicate the integrity of the judicial process." *People v. Nunez*, 236 Ill. 2d 488, 493 (2010).

¶ 42     Pursuant to the one-act, one-crime doctrine, "a defendant may not be convicted of multiple offenses that are based upon precisely the same single physical act." *People v. Johnson*, 237 Ill. 2d 81, 97 (2010). If only one physical act was undertaken, then multiple convictions are improper. *People v. Artis*, 232 Ill. 2d 156, 165 (2009). We agree with the parties that Mr. Woods's two armed robbery convictions were predicated on the same physical act.

¶ 43     When there is a violation of the one-act, one-crime doctrine, the reviewing court should impose a sentence on the more serious offense. *Id.* at 170. Here, armed robbery with a firearm (count IV) and armed robbery with personal discharge of a firearm (count V) are both Class X felonies. Compare 720 ILCS 5/18-2(a)(2), (b) (West 2012), with 720 ILCS 5/18-2(a)(3), (b) (West 2012). However, armed robbery with personal discharge of a firearm requires a mandatory sentence enhancement of 20 years' imprisonment, while armed robbery with a firearm requires a mandatory sentence enhancement of 15 years' imprisonment. See 720 ILCS 5/18-2(b) (West 2012). Therefore, armed robbery with a firearm (count IV) is the less serious offense. See *Artis*, 232 Ill. 2d at 170 ("In determining which offense is the more serious, a reviewing court compares the relative punishments prescribed by the legislature for each offense," as greater punishment is mandated for the more serious offense). Accordingly, on remand, the trial court should merge the finding of guilt on the armed robbery with a firearm count into the armed robbery with personal discharge of a firearm count and resentence Mr. Woods only on the latter.

¶ 44                                    C. Fines and Fees

¶ 45     Mr. Woods next argues that four monetary charges were improperly assessed and should be vacated, one fee is actually a fine subject to presentence incarceration credit, and he should receive credit for the 1097 days he spent in presentence custody to offset the imposed fines. We will address these issues because they may arise again on remand.

¶ 46    Even though Mr. Woods did not challenge these assessments before the trial court, they are reviewable both under the plain error doctrine and pursuant to section 110-14(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/110-14(a) (West 2010)). *People v. Mullen*, 2018 IL App (1st) 152306, ¶¶ 38-39. The State agrees that the fines, fees, and costs order contains errors and, again, we urge the State to make these concessions at the trial level.

¶ 47    Mr. Woods first asserts, and the State correctly concedes, that the $250 DNA fee (730 ILCS 5/5-4-3(j) (West 2012)), the $5 electronic citation fee (705 ILCS 105/27.3e (West 2012)), the $100 trauma fund fine (730 ILCS 5/5-9-1.10 (West 2012)), and the $5 court systems fee (55 ILCS 5/5-1101(a) (2012)) were improperly assessed and should be vacated. We agree. See *People v. Smith*, 2018 IL App (1st) 151402, ¶ 12 (finding where a defendant's prior felony conviction occurs after 1998, we presume his DNA is already in the database, the DNA fee was previously assessed, and electronic citation fee does not apply to felony convictions); *People v. Bryant*, 2016 IL App (1st) 140421, ¶¶ 21, 23 (finding $100 trauma fund fine only applies to specified firearm offenses); *People v. Harris*, 2012 IL App (1st) 100077, ¶ 28 (finding court systems fee only applies to violations of the Illinois Vehicle Code (625 ILCS 5/1-100 *et seq.* (West 2012))). Accordingly, upon remand, these improperly-assessed fees should not reappear on the new fines and fees order.

¶ 48    Mr. Woods next requests a $5 *per diem* credit for the 1097 days he spent in presentence incarceration to offset the imposed fines. A defendant incarcerated on a bailable offense who does not post bail and against whom a fine is imposed is allowed a $5 credit for each day spent in presentence custody. 725 ILCS 5/110-14(a) (West 2012). Mr. Woods spent 1097 days in presentence custody and is thus entitled to up to a $5485 credit to offset certain imposed fines.

¶ 49    Mr. Woods asserts, and the State agrees, that his credit should be applied to the following

fines: the $10 mental health court fine (55 ILCS 5/5-1101(d-5) (West 2012)), the $5 youth diversion/peer court charge (*id.* § 5-1101(e)), the $5 drug court fine (*id.* § 5-1101(f)), and the $30 children's advocacy center assessment (*id.* § 55 ILCS 5/5-1101(f-5) (West 2012)). The fines and fees order already reflects that these fines should be offset by the credit. However, Mr. Woods's order does not reflect whether he actually received this credit for the 1097 days spent in presentence incarceration. Thus, on remand, we direct the trial court to ensure the offset is reflected on the new fines and fees order.

¶ 50    Mr. Woods also argues, and the State correctly concedes, that the $15 state police operations charge (705 ILCS 105/27.3a(1.5) (West 2012)) is also a fine subject to presentence incarceration credit. See *People v. Brown*, 2017 IL App (1st) 150146, ¶ 36 (finding the $15 state police operations charge to be a fine subject to offset by the credit). This credit should also be reflected on any fines and fees order on remand.

¶ 51                                   IV. CONCLUSION

¶ 52    For the reasons set forth above, we vacate Mr. Woods's sentence and remand this case to the presiding judge of the criminal division for resentencing before a different judge with a new PSI. We direct the trial court to merge the finding of guilt of count IV into count V and to sentence Mr. Woods only on count V. Any fines and fees imposed on remand should not include the $250 DNA fee, $5 electronic citation fee, $100 trauma fund fee, or $5 court system fee, since these do not apply to Mr. Woods's case. If it is imposed, the $15 state police operations fee should be treated as a fine, and any fines imposed should be offset by presentence incarceration credit on the fines and fees order.

¶ 53    Sentence vacated; remanded with directions.

¶ 54     JUSTICE PIERCE, specially concurring:

¶ 55     Although I agree with the majority that this case should be remanded for resentencing, because there is an insufficient record establishing a violation of defendant's constitutional rights, I do not agree with the majority's reasoning in ordering a new sentencing hearing. In my view, resentencing is required because the record shows that the trial court's reasoning in imposing its sentence is not supported by the record or the presentence investigation report and the defendant was prejudiced as a result.

¶ 56     The majority mistakenly conflates two issues in finding that "the trial court plainly erred by insisting that Mr. Woods cooperate with the PSI and then using this information against him as reflected in the repeated reference to Mr. Wood's past gang participation and educational history." There are two distinct issues of import here: (1) the effect of the trial court ordering defendant to participate in the PSI and (2) the use of the information obtained during the PSI in sentencing.

¶ 57     There is no dispute in this case that the trial court "ordered" defendant to speak with the probation department with respect to the PSI after the court was informed that defendant "did not talk to probation for the PSI" the first time. I believe it is likely that this lack of cooperation was viewed by the trial court as conduct that was not helpful to the defendant and that he would probably be better off if he cooperated so that the court would potentially have mitigating evidence to consider. There is similarly no dispute that defendant had a fifth amendment right not to be compelled to provide information during the PSI that could be used against him at sentencing. *People v. Ashford*, 121 Ill. 2d 55, 80 (1988). However, notwithstanding the trial court's order to cooperate, I find the record here is patently insufficient to establish that defendant was compelled to provide information during the PSI in violation of his fifth

amendment rights and that this claim should be brought in a postconviction proceeding where a complete record can be established and considered by the circuit court and later, if necessary, by the appellate court.

¶ 58    There is simply no indication here of what happened after the court "ordered" defendant to speak with the probation department. It is undisputed that defendant intentionally refused to answer questions regarding the offense, even though he answered questions dealing with his background. By refusing to answer questions about the offense, the defendant did not succumb to the court's order to cooperate. This refusal indicates he made a choice of which questions to answer and which questions to refuse to answer. It is entirely possible that defendant's counsel could have counseled defendant on the potential value of cooperating with the probation department so that his background could be used as persuasive mitigation evidence. Also, defendant may have seen the wisdom of this advice and better understood the circuit court's attempt to learn more about his non-criminal background before sentencing him based only on the nature of the offense and his criminal history. Further, defendant could have been (and likely was) *Mirandized* before his PSI interview, and he could have knowingly and voluntarily waived his fifth amendment rights. In short, we simply do not have an adequate record from which to decide whether a constitutional violation resulted from the order of the trial court to cooperate with the PSI.

¶ 59    When a defendant asks a court of review to consider constitutional issues that rely on matters outside of the record, those issues are best reserved for a timely postconviction petition. *People v. Page*, 193 Ill. 2d 120, 135 (2000). Our supreme court recently instructed that consideration of an as-applied constitutional challenge on direct review requires a developed record and a developed record is best presented in postconviction proceedings. *People v. Harris*,

2018 IL 121932, ¶ 39. "The critical point is not whether the claim is raised on collateral review or direct review, but whether the record has been developed sufficiently to address the defendant's constitutional claim." *Id.* ¶ 41. Here, defendant made no effort to bring to the trial court's attention the constitutional claim now raised on direct appeal: his being compelled to cooperate with his PSI. There is no record of what, if any, advice his counsel provided him. There is no record of whether he was advised of his *Miranda* rights, whether he understood those rights, and whether he knowingly and voluntarily waived them. There is no affidavit from the defendant attesting to whether he was compelled to make a statement. The only basis for this claim is the trial court's order and the unsupported argument made on appeal that amounts to nothing more than pure speculation on whether a constitutional violation occurred. This issue is best reviewed, analyzed, and adjudicated at the postconviction stage. 725 ILCS 5/122-1 *et seq.* (West 2016).

¶ 60    In summary, defendant raises an important issue based solely on the trial court's statement, but leaves a gaping hole in establishing a violation of a constitutional right because of a totally deficient record that supports his argument. Defendant's constitutional argument, at this stage, is purely speculative and should not be decided unless that argument is supported by evidence contained in the record. I cannot tell from the record before us why defendant candidly provided some information and withheld other information for the second PSI. Defendant has not submitted an affidavit or any other evidence that would allow us to ascertain if he willingly gave up his rights or was truly compelled.

¶ 61    That stated, I agree with my colleagues that a new sentencing hearing is required because the sentencing comments of the trial judge reasonably indicate that the court used some of the information provided by the defendant, his prior gang affiliation, as an aggravating factor where

it was offered as a mitigating factor of the PSI. However, I find that the use of this information was in error because of the way in which the trial judge used the information contained in the PSI to the defendant's prejudice, not because the defendant was *arguably* compelled to give it.

¶ 62    A "defendant shall not be sentenced for a felony before a written presentence report of investigation is presented to and considered by the court." 730 ILCS 5/5-3-1 (West 2014). A PSI must contain information regarding the defendant's "history of delinquency or criminality, physical and mental history and condition, family situation and background, economic status, education, occupation and personal habits." *Id.* § 5-3-2(a)(1). The trial court must consider the PSI when imposing sentence. *People v. Testa*, 125 Ill. App. 3d 1039, 1049 (1984).

¶ 63    The PSI prepared in this case shows that defendant admitted that he was a *former* member of a street gang. Defendant also indicated that he joined the gang when he was 13 years old but left when he was 24 years old because he wanted to be a positive role model for his younger half-brother. Instead of considering the fact that defendant was a *former* gang member and left the gang because he wanted to do positive things as mitigation, the court clearly used this information in aggravation, repeatedly referring to his membership in "gangs" and stating that the defendant returned to "gangs and guns" throughout his life. The court also indicated that "robbery, guns and gangs seems to be a repeated thing here" and that "[defendant] choose[s] to be involved with gangs and guns." There was no evidence that the underlying robbery was gang related in any way or that defendant was involved in a gang at the time of this offense. There was no evidence that the defendant had a pattern of repeatedly returning to guns and gangs after he quit the gang when he was 24 years old. There was also no evidence that defendant was involved in a gang at the time of this offense. I therefore find that the court relied on aggravating factors in imposing sentence that were not supported by the record or the PSI and that it is reasonable to

conclude that the trial court's reliance on these factors was prejudicial to the defendant. See

*People v. Ross*, 303 Ill. App. 3d 966 (1999); *People v. Holloman*, 304 Ill. App. 3d 177 (1999).

Accordingly, I would remand for resentencing on this basis alone.